[No. 38188.     En Banc.     December 28, 1967.]

STEPHEN CARABBA, *Appellant,* v. ANACORTES SCHOOL DISTRICT No. 103 *et al., Respondents.**

*Reported in 435 P.2d 936.

*Miracle, Treadwell & Pruzan,* for appellant.

*Harry A. Follman* and *Welts & Welts,* for respondent Anacortes School District No. 103.

*Elliott, Lee, Carney & Thomas* and *Richard Pitt,* for respondent Oak Harbor School District No. 201.

*Charles O. Carroll, James E. Kennedy, Richard M. Ishikawa, Lycette, Diamond & Sylvester,* and *Earle W. Zinn,* amici curiae.

DONWORTH, J.—This action was brought on behalf of Stephen Carabba, a minor, by his guardian ad litem to recover $500,000 for injuries sustained by Carabba while he was a participant in a high school wrestling match.

The amended complaint alleged that respondent school districts, acting through their agent, the referee, were negligent in the following particulars:

1. Failing to adequately supervise the contestants;

2. Allowing his [the referee's] attention to be diverted from the actions of the contestants;

3. Allowing an illegal and dangerous hold to be applied;

4. Failing to immediately cause the said hold to be broken;

5. Allowing the said hold to be prolonged for a substantial period of time;

6. Violating the provisions of the 1963 official Wrestling Guide of the National Collegiate Athletic Association.

Respondents denied that the referee was acting as their agent, denied the allegations of negligence, and affirmatively urged the bar of RCW 28.58.030, relating to athletic appliances, urged the affirmative defenses of volenti non fit injuria, assumption of risk, and failure to join an indispensable party to the action. The trial court ruled out the affirmative defenses, and instructed the jury that the referee was the agent of respondents as a matter of law.

Thirty-eight witnesses testified during the 20 days of trial, and the record before this court is voluminous, the statement of facts alone consisting of over 2,300 pages.

The case was submitted to the jury solely on the issues of the referee's negligence and damages.

During the course of their deliberations, the jury requested an additional instruction regarding the standard of care applicable to the referee, *i.e.* the standard of the reasonably prudent man or that of an ordinarily prudent referee. This requested instruction was given by the court, pursuant to a stipulation of the parties, which told the jury that the standard to be applied was that of the ordinarily prudent referee.

The jury thereafter returned a verdict for respondents. Appellant moved for judgment n.o.v. or for new trial based primarily upon four specific instances of claimed misconduct on the part of counsel for respondents and denial of substantial justice. The trial court denied the motions, and this appeal followed.

Although the factual background of this case is not material to a determination of the issues which we reach on this appeal, and the evidence regarding the material factual issues relating to liability is in substantial dispute, a brief statement of that factual background will assist in understanding the case.

The jury could have found, from the evidence presented, that on January 31, 1963, a wrestling meet was held at Anacortes High School between the wrestling teams of Anacortes High School and Oak Harbor High School. The

meet was sponsored jointly by the student body associations of those two schools.

The referee for this meet was Mr. Robert L. Erhart, a state trooper, and a member of the Northwest Wrestling Officials Association.[1]

In one of the matches held during that wrestling meet, Stephen Carabba, a senior at Anacortes High School and a member of that school's varsity wrestling squad, was opposed by Roger Anderson, a senior at Oak Harbor High School. Both boys wrestled in the 145-pound-weight division.

Near the end of the third round[2] of the match between these two boys, Anderson, who was well ahead on points, was attempting to pin Stephen Carabba's shoulders to the mat and thus score additional points for his team. In the course of this attempt, he was alternating half nelsons,[3] first to one side and then to the other, trying to roll Carabba into a pin position. This process had taken the boys to the northwest corner of the main mat[4] near where small side mats were placed against the main mat. The referee, Mr. Erhart, noticed a separation between the main mat and the side mat, and moved to close the gap to protect the contestants should they roll in that direction and off the

---

[1]The association referred to is a volunteer group, independent of any of the schools involved, whose function it was to select, train, qualify, and provide officials to referee high school wrestling matches between schools in the district.

[2]In high school wrestling, each match is divided into three rounds consisting of 2 minutes of wrestling.

[3]A half nelson is described by one of the witnesses, Mr. Goldbloom, a high school wrestling coach, in the following manner: "A half nelson would be one arm of the applying wrestler under the arm of the other, and somewhere on the back of the neck, or head, applying pressure to turn the opponent to the opposite side, toward the opposite direction the hold is applied."

[4]The main mat, whereon the wrestling is supposed to be confined, is 24 feet square. Smaller tumbling mats are placed around the edge of the main mat to prevent the contestants from striking the hard wooden floor if they roll off the main mat.

main mat onto the bare floor. In so doing, his attention was diverted from the boys momentarily.

While the referee's attention was so diverted, Anderson applied what appeared to many of the eyewitnesses to be a full nelson.[5] The estimates made by the witnesses of the length of time during which the full nelson was applied varied from 1 to 10 or more seconds.

Almost simultaneously the buzzer sounded the end of the round, the referee blew his whistle, and Anderson broke the hold on Carabba after a final lunge. Carabba slumped to the mat, unable to move due to the severance of a major portion of his spinal cord resulting in permanent paralysis of all voluntary functions below the level of his neck.

Appellant assigns as error, the trial court's denial of his motion for new trial based upon four specific acts of alleged misconduct by counsel for respondents, and upon the total effect and interacting nature of that misconduct resulting in the denial of a fair trial to appellant. Each of the acts of alleged misconduct will be discussed separately.

The first occurrence of alleged misconduct was on the sixth day of the trial when Dr. Donald Ray Silverman, called as a witness on behalf of appellant, was on the stand. Dr. Silverman had testified on direct examination as to the nature and extent of injuries suffered by Stephen Carraba, and the nature and cost of the care that had been and would be required in view of those injuries. He was then asked the total of the charges made by University Hospital for the previous care of Stephen Carraba. The following then occurred:

Mr. Lee: May I have a question on voir dire? The Court: You may. Mr. Lee: Doctor, during the recess you have allowed me to look at the records from which you have been testifying, the hospital bills indicated here, and let me ask you this, there has been a substantial

---

[5]The full nelson was described by Mr. Goldbloom in the following manner: "A full nelson would be the same thing [as a half nelson] with both sides where the arms go under both arms, placed on the back of the neck area, anywhere from the head, back of the neck and pressure would be applied down, forcing the person's chin to his sternum, or breastbone."

amount of benefit, as I understand, paid by various eleemosynary institutions, like the Crippled Children, is that right? Mr. Miracle: Your Honor, please, this is immaterial. Mr. Lee: Your Honor, I think it is. Mr. Miracle: Your Honor, direct gifts— The Court: Have you made an inquiry of the fair amount of charge for the services rendered? Mr. Lee: May I ask this question, is there a different charge made by the University Hospital, or has there been in this case, dependent upon whether there has been assistance from some other source? Mr. Miracle: Your Honor, please, this is improper. Immaterial. The Court: Objection sustained. Mr. Lee: Has there been any other charge or price than that which you have indicated? The Court: Objection sustained. Proper inquiry is whether or not that is a reasonable charge for the services rendered, Mr. Lee. Mr. Lee: Very well, your Honor.

This occurrence took place in the presence of the jury.

Appellant contends that his case was unfairly prejudiced by this occurrence in two respects. First, the jury could have concluded from the remark of counsel that, if it returned a defense verdict, appellant would still have other sources of financial help upon which he could rely. This prejudice is magnified, appellant argues, by the circumstances of this case in which the jurors could have felt that their financial interests were adverse to those of appellant, a matter that will be discussed later in this opinion.

The second argument made by appellant in this regard is that the statement tended to make more credible testimony by the referee, Robert Erhart, to the effect that the day following the injury he had given a written statement conceding that he had been at fault in taking his eyes off the wrestlers momentarily, only because he was led to believe that such a statement was needed in order to qualify Stephen Carabba for assistance from some crippled children's fund.

Respondents, on the other hand, argue that, first, the question was never answered. Secondly, in the absence of the jury following this incident, counsel for appellant stated to the court:

Mr. Miracle: . . . The only cure, is a curative instruction or a mistrial. Naturally, I don't want a mistrial.

I think we are entitled to have a cautionary or curative instruction given the jury in connection to the hospital bills covering the subject brought into the case by that voir dire question by Mr. Lee at that time, and I am asking the Court at this time to either make a note of it so that we can have an appropriate instruction when the time comes, or to have such action as the Court seems appropriate. The Court: What I have done so far is to state in the presence of the jury that the only proper question is the reasonableness of the bill. You feel some other or further instruction may be needed? Mr. Miracle: That's the way I felt, because as I say, No. 1: I believe this is misconduct, and I believe it was intentional—

. . . .

The court noted Mr. Miracle's request, but no curative instruction was given by the court. No exception was taken to the trial court's failure to so instruct, nor was any request for such an instruction made later in the trial.

This matter was again before the trial court on appellant's motion for a new trial after the adverse jury verdict. Regarding this incident, the trial court, in its oral opinion, stated:

In relation to the subject matter of Mr. Lee's examination of Dr. Silverman in relation to hospital bills, this all appears of record, counsel stated to the witness on the stand he had looked at the record of the bills, that he had had an opportunity to review them, then he asked a question that was really not a question, it was a statement. He didn't inquire "has anyone else paid these bills", so that proper objection could be made to the subject matter of an eleemosynary institution and collateral source coming into the trial. Counsel's question injected that matter before the jury, ringing a bell, so that the effect would be accomplished regardless of what the ruling is. Now, I think to anyone experienced in trial work this is not an unheard of, or unusual occurrence. I think it is misconduct in the legal sense, because it is an effort by the attorney advocating a cause to see to it that something gets before the jury. The statement of counsel, and I am quoting "There has been a substantial amount of benefit paid by various eleemosynary institutions, like the Crippled Children's, is that not right?" Having just stated he had looked at them. This is a matter I stren-

uously feel legally inadmissible and improperly put before the jury in such a way that objection cannot prevent it being placed before the jury. The bell has been rung. This is an item of misconduct that plaintiff is relying on. I think what I have said indicates my thinking of how I think it is misconduct, the nature of the misconduct that it is, and it certainly appears of record. There is nothing I know that doesn't show right in the transcript as to what occurred for the supreme court to look at in that connection.

The second instance of misconduct upon which appellant based his motion for new trial, and upon which this appeal is based, occurred during appellant's rebuttal, and on the last day of the trial.

Due to Stephen Carabba's helpless condition, his mother was required to bring him to the courtroom in a wheelchair so that he might testify on rebuttal. As she was about to take Stephen from the courtroom, counsel for respondent Anacortes School District asked to put her on the stand. He then asked her:

Q. Mrs. Carabba, I'm Mr. Welts, Mrs. Carabba. You were here earlier, three weeks or so ago. I don't believe I asked you anything as I thought you would be coming back like Mr. Carabba. Now, I want to ask you a couple of questions. A. All right. Q. Do I understand that you were at this wrestling match and saw it? A. Yes. Q. And during the latter part of it up to when this happened you were watching your boy Stephen and the other boy? A. Quite closely. Q. Very closely. A. Naturally. [Colloquy omitted.] Q. Quite closely, and you saw what they were doing then, I presume? A. I saw what they were doing. I was not aware of the implications of it. Q. Not of the result, of course. But you were watching them? A. Yes. Mr. Welts: That's all I wanted to find out.

Counsel for Oak Harbor then asked Mrs. Carabba:

Q. Mrs. Carabba, is this your statement? A. Yes, it is. Q. And I am referring to defendant Oak Harbor's exhibit 87, and by that I am referring to a letter which was postmarked February 4th. Mr. Miracle: Your Honor. Just a moment! You can't read off an exhibit until it is in evidence. I haven't seen it yet. Mr. Welts: I haven't seen it either, your Honor. Mr. Miracle: Your Honor, he can't

read from it until we have had an opportunity to examine it. Q. (Mr. Lee) Let me ask this, if you recall several days after Steve's accident writing a letter to the Andersons [parents of Roger Anderson], the letter being postmarked February 4, 1963? A. Yes, I do. Q. And do you recall declaring in that letter— Mr. Miracle: Object to that. The Court: Sustained. Q. Let me ask you if you did not view this as an unfortunate happening?

Regarding this occurrence, the trial court, in its oral opinion on the motion for new trial, stated that:

The questioning of Mrs. Carabba by Mr. Lee, which is urged by the plaintiff's relating to exhibit for identification number 87, I feel that Mr. Lee's question was improper from the standpoint of how a lawyer should question on the subject matter, and certainly his questioning of Dr. Silverman in the manner mentioned is improper. The only thing that the record possibly doesn't show is that Mr. Lee had exhibit 87 in his hand at the time. The record shows very clearly that Mr. Lee had just asked the witness if she remembered writing this letter, exhibit 87, and referred to it by date. Then the question was asked "Do you recall declaring in that letter—" and there was an objection and it was sustained. That should have ended the matter of injecting the content of the exhibit before the jury. The immediate question of Mr. Lee asked was "Let me ask you if you did view this as an unfortunate happening?" No one can read the record without seeing that this pointedly got before the jury a very direct inference that is what that letter said. The question wasn't "How did you view this?" To which an objection might have been sustained. The question stated how she viewed it, so that even though the objection is sustained the result is accomplished. I think any reviewing judge or any trial lawyer recognizes the technique. There is no mystery about it. It is perfectly clear that every one, every lawyer wants to ring a bell, so that if the ruling is against him the bell has still been rung. I think that that doesn't change the fact that it is improper for the lawyer to do so. It is legal misconduct to do so. It injects a matter for the jury that doesn't belong there, and this is true whether the court is right or wrong or whether the matter belongs before the jury, because the very purpose of the methods of approach is to prevent the legal ruling from being effective. Now, I feel that the

—that a letter made by a child's mother in which she expresses such an opinion about the event is totally inadmissible in the child's lawsuit. Any attorney who feels it is admissible has a right and a duty to try and get it admitted, but not the right to inject it in this manner. This entire matter was clearly not cross examination of anything that this witness had said while testifying on direct for the plaintiff.

The third instance of claimed misconduct occurred during closing argument by counsel for Anacortes wherein he stated to the jury:

May I have a large crayon, please? When we started this business here and I made an opening statement to you, I started it out with some squares at the top of which was "School District" and then we had a "Students' Association".

Mr. Miracle: Your Honor, this is outside the issues. Mr. Welts: It is not outside the issues as I am going to use it, my friend. The Court: It is not outside the issues at this point. It may develop so. Objection overruled. (Mr. Welts writing on easel) The Court: I have a disadvantage of not seeing it. Mr. Miracle: So do I, your Honor. Mr. Welts: I am writing "School District", "Student Body", "Pool, Commissioner". Mr. Miracle: Thank you, Mr. Welts. Mr. Welts: And the next is referee, and the next is the match. Mr. Lee: Robin, does this mark any better? Mr. Welts: No, this is all right. Mr. Lee: You can try that if you want to. Mr. Welts: Then I am writing "Match", "Stephen" and "Roger", and below that is guardian. What is this lawsuit about? It is a money suit by guardian against one other school district, grounded on claims of negligence which Mr. Miracle has alleged and the court has recited in his instructions, and to which I will refer directly, based on the idea and thought that through the process of refereeing there was negligence in law which has two phases. One is carelessness, which isn't actionable, and the other added to it— I will deal with that, is proximate cause, or becomes a proximate cause of injury on the basis that through this process the school district negligently caused—the school districts negligently caused injury to Steve, his—the guardian is entitled to collect money from the school districts.

It is not a problem involving any other rights against any other one along the chain. That is not for this jury,

or this time, but only, and one thing only in this case before this jury, did the school districts, one party, there are two—I am so tired I can't even write. There are only two parties here. These aren't parties. Does the school districts, the one party here in this lawsuit, owe guardian boy—because you find school districts negligently caused injury to Steve functioning through one called the referee.

Now, this is quite complicated. Let's see what this negligence business—(Interrupted)

Mr. Miracle: Your Honor, I'm sorry to interrupt but we think this argument is outside the instruction number eight.[6] The Court: Any reference to any other possible parties is beyond the scope of this lawsuit completely. Mr. Welts: I'm not going to use it that way, your Honor. Mr. Miracle: He has just done it, your Honor. The Court: The jury will disregard any reference to any other parties that are not in this lawsuit.

Regarding this incident, the trial court, in its oral opinion denying appellant's motion for a new trial, stated that:

One other item I want to mention that I think amounts to misconduct in a legal sense, and that is injecting something improperly before the jury, which was again in Mr. Welts' closing argument where he referred to other parties as potential defendants in some other lawsuit at some other time. The parties referred to in that argument had never been parties to this lawsuit. The litigation against any such other person, the referees' association, the student body or whichever ones they were, had never been in this case. No question of litigation against them had ever been presented. The defendants had claimed that this particular party was necessary in the chain of res-

---

[6]Instruction No. 8 stated that: "The defendant school districts owed a duty to the student participants in the wrestling match to exercise reasonable and ordinary care to protect them from injury during the wrestling match. Under the evidence in this case, the only person who was carrying out this duty of the defendants was the referee Robert Erhardt. Accordingly, the question of whether or not the defendant school districts were negligent is narrowed down to a question of whether or not the referee, Robert Erhardt, was negligent during the course of the wrestling match. If you find that the referee was negligent, then the school district defendants were negligent. If you find that the referee was not negligent, then the school district defendants were not negligent."

pondeat superior and the defendants had presented a great deal of evidence in that connection. The court had ruled otherwise, and Mr. Welts says that he had wanted to explain to the jury why there was no discussion, no consideration of all the evidence that he spent several days presenting. That is understandable. But it fails to explain to me why the discussion is necessary since we don't have to consider that the question of responsibility goes to these parties any more because of the ruling of the court. The statement made and repeated during that portion of the argument was that litigation against these other parties were not here involved. Of course they weren't. How could anybody really feel that rights against these other parties could possibly be affected by this lawsuit when they weren't parties to it. The suggestion was made that plaintiff might have litigation against some other people, some other defendants at some other time. Now, that doesn't belong in this lawsuit. It is improper in this lawsuit. The reference in this lawsuit. The reference that litigation against these other parties are not for this jury, not for this time, this only means that there might be some other jury some other time. It was an appeal to improper consideration.

The final occurrence of alleged misconduct by counsel for respondents took place during Mr. Welts' final argument to the jury, and consisted of the following remarks:

Ladies and gentlemen, I'm going to terminate this by saying only as each of you alone use the scales of justice, if because of a few expressions of opinion on time called eight seconds or what-have-you by a fan on the field, football or basket ball, or if wrestling, or what not. If, whenever anybody is hurt by—done through the use of those words testified to as fact, in court, whenever anything so happens, if, ladies and gentlemen, that is any scale of measuring, what should be done by the party school districts thereby through the referee who, one said, he looked the wrong way for five seconds, he had his eyes turned for five seconds or was looking wrong, and on the football field, or he didn't see the boy on the basket ball floor. He didn't see the wrestler. If every time such thing happened through such statement made later by such a person, the school districts through the referee negligently caused injury to that person, it is a risk of exposure that no one can face hereafter.

Mr. Miracle: Your Honor, object to the latter part of the argument, and I think the jury should be instructed to disregard it. The Court: Mr. Welts' comment about any risk of exposure is stricken. You shall disregard it. It is going beyond the issue of the lawsuit, thoroughly contrary to the court's instructions. You shall give it no consideration whatsoever.

Again, in its oral opinion, the trial court referred to this incident and stated that:

In Mr. Welts' closing argument to the jury he stated in effect that if by the testimony of spectators that football, basketball or wrestling events, if every time such occurrence happens the school districts, through the referee, are held negligent then—and I quote "It is a risk of exposure that no one can face hereafter." I think that can only be interpreted one way. It appeared to me when I heard it exactly as I read it and re-read it. A statement that the school districts will not be able to face the risk in the future if this sort of thing results in plaintiff's verdict is equivalent to saying that the athletic program will have to close down. And that, I think, should appear to any judge in looking at it in review, it has appeal to self-interest of the jury, and legally constitutes attorney misconduct. And I immediately followed it appeared to me that way and I so ruled and told the jury to disregard it. It appears to me exactly now as I read it the way it appeared to me when I heard it. I have already stated into the record that there was in fact a concern in this connection evidenced in the community. We might thereby assume that the jury had such concern.

Appellant argues that the harm resulting from this latter act of misconduct was magnified by the fact that counsel for respondent was speaking in behalf of the prosecuting attorney who had the power to shut down the school athletic programs if such a "risk" had to be faced.

Finally, appellant's argument on the cumulative effect of these acts of misconduct, which he asserts denied appellant a fair trial, is summarized in his brief as follows:

[O]ne or more jurors could well conclude:

1. No one should be held accountable, since plaintiff's mother, a highly interested spectator, concluded that no one was to blame.

2. A defense verdict would not cut off plaintiff from financial help, in any event, since

   a. he is the recipient of substantial benefits from charitable institutions, and

   b. he can fall back on claims against other responsible parties.

3. A plaintiff's verdict would cause a discontinuance of school sports programs in Skagit County, and this jury would bear direct responsibility for that result.

We have carefully examined the arguments of respondents relating to the four incidents involved, but find no reason to disagree with the trial court's characterization of them as misconduct. Nor can they be characterized as "harmless" occurrences.

The question presented, in reality, is whether these acts of misconduct were such that they were not, and could not have been, cured by the actions of the trial court, and whether appellant waived his right to obtain a new trial based on these incidents by his failure to request further action on the part of the trial court, *i.e.* granting a mistrial.

It is respondents' position that, in this case, the answer to the second question must be yes; for, where the aggrieved party objects to prejudicial matter injected in the trial, asks for a curative instruction or admonishment from the court and receives it, he waives his right to rely upon that matter on motion for new trial unless he also requests that the court declare a mistrial. Respondent cites several cases in support of his position, *e.g., Jones v. Hogan,* 56 Wn.2d 23, 351 P.2d 153 (1960), *Nelson v. Martinson,* 52 Wn.2d 684, 328 P.2d 703 (1958), *Sun Life Assur. Co. of Canada v. Cushman,* 22 Wn.2d 930, 158 P.2d 101 (1945). He quotes from the latter case, at 945, the statement that:

[B]ut respondents had a remedy, and it was their duty, if they expected to claim error based upon the alleged misconduct of appellant and the jury, not only to call the matter to the attention of the trial court, but also to claim a mistrial and ask that the jury be discharged . . . .

Respondents recognize the exception to the rule stated that, where the misconduct is so flagrant and prejudicial

that no instruction to disregard it would have cured it, but contend that the exception can apply only where there has been no curative instruction given nor objection made. In short, respondents argue that, if the aggrieved party asks for any remedy at all, he must ask for the ultimate remedy of mistrial or be held, because of his objection and request for a curative instruction, to have waived any right to further rely upon the claimed error. We do not agree with this interpretation.

■    Where objection is made to an act of misconduct and a curative instruction or admonishment is given as requested, the basis for holding that the aggrieved party is not entitled to rely upon the claimed act of misconduct must be that the instruction or admonishment was sufficient to cure the harm caused by the misconduct, not that there has been a waiver of his right of reliance by the act of objecting.

The controlling case is *Warren v. Hart*, 71 Wn.2d 512, 429 P.2d 873 (1967), wherein, at 517, it was stated by this court, sitting en banc, that:

Respondent wife argues that, since appellant did not make objection to her counsel's conduct at the time it occurred or ask the trial court to declare a mistrial or instruct the jury to disregard counsel's statement, she has waived her right to claim that it constituted reversible error which entitled her to a new trial. In support of this argument, respondent wife cites *Nelson v. Martinson*, 52 Wn.2d 684, 328 P.2d 703 (1958), which supports her contention as to the general rule applicable to such a situation.

However, there is a well recognized exception to that rule where the misconduct is so flagrant and prejudicial that no instruction to disregard it would have cured it.

We can conceive of no basis for distinguishing that case from the present one on the ground that appellant here did object to the misconduct at the time it occurred. The lodging of an objection cannot be deemed to constitute waiver. Prior decisions of this court, where inconsistent, must be deemed to have been overruled by *Warren v. Hart, supra.*

In this connection, we note that the trial court, in denying appellant's motion for a new trial, relied heavily upon what he felt to be "a strong element of this philosophy that we refer to as gambling on the verdict," and concluded that, "In viewing the case on its four corners, I deny the motion."

We feel that this reliance was misplaced in view of the preceding discussion relative to waiver, at least where, as here, the acts of misconduct relied on by appellant occurred near or at the end of the trial. *Warren v. Hart, supra.*

The necessary inquiry, therefore, is whether the incidents of misconduct referred to were so flagrant that no instruction of the court, or admonition to disregard, could suffice to remove the harm caused thereby. If such is the case, appellant's failure to bolster his objections by moving for a mistrial did not waive, and the instruction and admonitions by the trial court did not cure, the harm produced. The only effective remedy is a new trial, free from prejudicial misconduct of this magnitude.

█ We agree with the trial court's characterization of the four specific acts of misconduct as prejudicial and incurable. But we hold that the trial court was in error in balancing against these acts and their effect what the court referred to as "gambling on the verdict." This latter concept has no place in the court's consideration of a motion for a new trial where the acts upon which such motion is based are acts of prejudicial misconduct, which were incurable, especially where such acts occurred at or near the end of the trial. To hold otherwise would be to place appellant on the horns of an impossible dilemma. Appellant has been denied a fair trial, and the judgment of the trial court must, therefore, be reversed.

Pursuant to ROA 16, respondents contend that the trial court was in error in instructing the jury that the negligence of the referee, if any, rendered the school districts liable in damages to appellant,[7] and that upon retrial of

---

[7] Instruction No. 8 is quoted *supra* at 949.

this case this error should not be repeated. We are assisted in this regard by the briefs of two amici curiae.

In essence, respondents contend that the school districts played no part in this wrestling competition; that the matches were sponsored by the associated student bodies, which are entities separate from the school districts; that the referee was qualified and selected by the referees' association, an entity separate and apart from either the school district or the student body associations; and that the referee, in the performance of his function, occupied the status of an independent contractor. This being the case, they contend, no liability may arise on the part of respondent school districts, however negligent the referee might have been.

On the other hand, appellant contends that the school district respondents owed a nondelegable duty to protect the students participating in the interscholastic wrestling matches which took place on the school premises.

■ The duty owed by a school district to its pupils has been recently stated by this court to be:

[T]o anticipate reasonably foreseeable dangers and to take precautions protecting the children in its custody from such dangers. The child may sue the school district for injuries resulting from its failure to protect the child.
. . .
". . . a school district may be liable for injuries sustained as a result of negligent supervision or failure to supervise activities of its students. . . ." *Tardiff v. Shoreline School Dist.*, 68 Wn.2d 164, 170, 411 P.2d 889 (1966).

One basis for the duty thus imposed upon the school district is to be found in the relationship between the parties:

It is not a voluntary relationship. The child is compelled to attend school. He must yield obedience to school rules and discipline formulated and enforced pursuant to statute. [Citations omitted.] The result is that the protective custody of teachers is mandatorily substituted for that of the parent. *McLeod v. Grant Cy. School Dist. No. 128*, 42 Wn.2d 316, 319, 255 P.2d 360 (1953).

See, also, *Rodriguez v. Seattle School Dist. No. 1,* 66 Wn. 2d 51, 401 P.2d 326 (1965); *Briscoe v. School Dist. No. 123,* 32 Wn.2d 353, 201 P.2d 697 (1949).

In the case at bar, there is lacking the involuntary relationship. However, it is not the law that *only* in the case of an involuntary relationship may the school district be held liable for an injury. For example, see *Sherwood v. Moxee School Dist. No. 90,* 58 Wn.2d 351, 363 P.2d 138 (1961), which involved the death of a student as a result of injuries sustained during the initiation ceremony of a high school lettermen's society; and *Morris v. Union High School Dist. A,* 160 Wash. 121, 294 Pac. 998 (1931), which involved injuries sustained by a student participant in a football game; and *Juntila v. Everett School Dist. No. 24,* 178 Wash. 637, 35 P.2d 78 (1934), which involved injuries sustained by a student in a fall from bleacher seats at a football game. The school districts in each of these cases could be held liable, although the students were not in compulsory attendance at the functions involved.

It is clear, therefore, that the liability of the school district is not limited to those situations contemplated by the rationale set forth in *McLeod v. Grant Cy. School Dist. No. 128,* 42 Wn.2d 316, 255 P.2d 360 (1953).

It is likewise clear that potential liability on the part of the school districts is not limited to those situations involving curricular activities. The comments of Hill, J., in his special concurrence in the *Sherwood* case, *supra,* seem particularly pertinent to this question. He said, at 360, that:

> The attempt of the respondent school district to limit the scope of its authority to matters within the curricular activities, and happenings on the school premises is not realistic. That schools do employ athletic coaches, band directors, even debate coaches, and do exercise supervision and control over numerous extra-curricular activities is common knowledge. The justification is their educational and cultural value.

In the present case, it is clear that the wrestling matches were conducted "under the auspices" of the respondent

school districts.[8] That the school districts actively encourage participation by students in such sports programs is beyond question. The schools provide coaches for the training of participants. They provide the premises upon which such activities are engaged in by the students and the equipment which is used in the wrestling matches.

Under these circumstances, we must conclude that the school districts do, in fact, owe a duty to the student participants.

■ The nature of that duty, we feel, is as stated in Restatement (Second) of Agency § 214 (1957):

A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.

In Comment *a* thereto, it is said that:

There are three forms of the duty of protection. First, a person may have a duty to protect another which can be performed either by exercising care personally in protecting the other or by exercising care in the employment of an independent contractor to protect the other. Secondly, there may be a duty to protect another at all hazards, a duty which is not fulfilled unless the other is protected and which is not satisfied by the use of care. This duty normally exists only when undertaken by contract. Thirdly, *one may have a duty to see that due care is used in the protection of another, a duty which is not satisfied by using care to delegate its performance to another but is satisfied if, and only if, the person to whom the work of protection is delegated is careful in giving the protection.* In this third class, the duty of care is non-delegable. (Italics ours.)

---

[8] The fact that the wrestling matches were nominally staged by the student-body associations of the schools can afford no shield against liability on the part of respondent school districts under the facts appearing in this record, *e.g.*, the participation of the faculty in the governing and operating of the student associations, and the full veto power possessed by the schools over proposed actions of the student associations.

We feel that the duty owed the student participants in this wrestling match, under the facts of this case, is similar to that imposed upon the school districts while the students are in involuntary attendance during school hours, *i.e.*, a duty to provide nonnegligent supervision, similar to that described in the third proviso of Comment *a* of the Restatement, quoted above.[9]

Having carefully considered respondents' cited cases and the argument to the contrary, we conclude that the trial court was not in error in instructing the jury that, if the referee was negligent, the school district must, as a matter of law, respond in damages.

■ Also, under ROA 16, respondents contend that it was error for the trial court to refuse to submit the issue of volenti non fit injuria to the jury, since appellant did volunteer to participate in this wrestling match with the knowledge that he could be injured. However, we must agree with the trial court that one is never held to "assume the risk" of another's negligence or incompetence. The doctrine is inapplicable and the trial court did not err in refusing to submit the issue to the jury.

Respondent Oak Harbor High School contends that the trial court should have submitted the issue of appellant's contributory negligence to the jury. But we find nothing of substance in the record to justify the trial court in so doing. The trial court did not err in refusing to submit this issue to the jury.

We further find that respondent's proposed instruction bearing on the statutory exemption in the case of failure of athletic equipment (RCW 28.58.030) was properly excluded by the trial court because it was not applicable to the facts of this case.

---

[9]Appellant contends that the duty owed is similar to that of a landowner to an invitee upon his premises, citing *Kidwell v. School Dist. No. 300*, 53 Wn.2d 672, 335 P.2d 805 (1959), wherein this court held that a pupil was an invitee upon the school premises. This court pointed out in that case: "We are not here concerned with the school district's duty to supervise its young charges."

In the present case, this is precisely what we are concerned with of necessity. The cited case is inapplicable.

Having carefully considered respondents' remaining contentions under ROA 16, we conclude that they are without merit.

The trial court's judgment, dismissing appellant's action with prejudice and awarding respondents judgment for costs and disbursements, is reversed, and the cause is remanded for retrial to be conducted in accordance with the views expressed in this opinion.

FINLEY, C. J., HILL, WEAVER, ROSELLINI, HUNTER, HAMILTON, and HALE, JJ., concur.

NEILL, J., concurs in the result.

February 14, 1968. Petition for rehearing denied.

