[No. 41-40270-1.   Division One.   December 15, 1969.]
Panel 1

KENNETH R. MARTIN, *Appellant*, v. WEYERHAEUSER
COMPANY, *Respondent.*

*Jackson, Ulvestad & Goodwin* and *Daniel G. Goodwin* for appellant.

*Moore, Walstead, Hallowell & Mertsching* and *O. H. Husemoen,* for respondent.

JAMES, C. J.—Plaintiff Martin is a journeyman sheet metal worker. His employer, W. Heaton and Son, a sheet metal company, contracted with defendant Weyerhaeuser to remove deteriorated sheet metal ventilation ducts from the rafters of Weyerhaeuser's paper mill. Martin was injured June 30, 1964, when he stepped upon and his foot

broke through the sheet metal housing of a fan which was a part of a different duct system designed to remove moist air from one of the paper machines.

Martin claims that Weyerhaeuser was negligent in failing to warn him of the deteriorated condition of the metal forming the housing upon which he stepped. By appropriate instructions, three issues were submitted to the jury: primary negligence, contributory negligence, and volenti non fit injuria.[1] The verdict was for Weyerhaeuser. Martin's assignments of error challenge principally the submission of the volenti defense. Under the provisions of CAROA 17, Weyerhaeuser assigns error to the trial judge's denial of its challenge to the sufficiency of the evidence at the close of Martin's case.

Martin's burden on appeal is to demonstrate that there is no evidence or reasonable inference therefrom to warrant submission of the volenti defense. The evidence relied upon by Weyerhaeuser in support of the defense is this:

Martin had been continuously employed in the sheet metal trade since 1948. He was experienced in both new installations and in repair and replacement work in paper mills. He was foreman of a crew of sheet metal men and as such supervised the job. The ducts to be replaced were installed in the rafters of the building above the hoods, blowers, and ducts connected to the various paper machines. These ducts were not part of the paper machine system but were designed to provide ventilation for the building.

Martin was given the blueprints and the responsibility of laying out the job. Weyerhaeuser exercised no control whatever over the job. Martin visited the mill shortly before the job was to begin and determined what ladders, "safeway" planks, handlines, and other equipment would be needed. On the day the job commenced, the crew's first job was getting the "safeway" planks up into the rafters to

---

[1] "He who consents cannot receive an injury." Black's Law Dictionary 1746 (4th ed. 1951).

provide a platform upon which the men could work. They did so under Martin's direction by placing a ladder at the side of one of the paper machines to enable them to pull the planks up to the top of the hood over the machine. They then carried the planks across the top of the hood and pulled them into the rafters with the handline. In traversing the hood over the machine it was necessary for them to step on the steel angle iron framework of the hood and avoid stepping upon the brittle transite panels which were laid in squares formed by the angle iron. An employee of Weyerhaeuser who observed Martin and his crew walking across the top of the hood warned them that they should be careful because the whole thing was rotten and rusted. Martin saw the rusted metal in the area but decided that it was safe to traverse the top of the hood so long as the men were careful to step only upon the heavier angle iron framing. Martin's attitude toward the hazard is illuminated by his testimony on cross-examination:

Q What did he say the man from Weyerhaeuser came and said? To watch out for the angle iron? A He said, "Pep, the machine tender said be damn careful, the angle irons are rusty." [Martin's nickname is Pepper.] Q As I understand your testimony this morning, you looked at the angle iron? A Yes, we did. Q Were they rusty? A Yes, there was rust on them. Q Were they deteriorated? A Not the heavy ones. Q The smaller ones were? A I don't recall. They were rusty. Q Did you make the decision then if you stayed on the heavy angle iron it would be all right? A These were the only ones we used in this. Q I understand from your testimony you made the decision it would be all right to go ahead as long as you stayed on the heavy angle iron? A Yes, sir. Q Although they had rust on them and you could see it? A They had rust on them, yes. Q When you were on the machine room floor and went up on the hood, was the paper machine running? A Yes, it was. Q You knew that when you went on the top? A Yes. Q Did you ever at any time require Weyerhaeuser to shut the paper machine down while you were up there? A No, sir, they didn't.

Martin and one other member of his crew went into the rafters and removed several sections of duct. These they

lowered to two other members of the crew who received them on a mezzanine floor situated near the paper machine hood. Because of the extreme heat in the area, Martin and the other workman decided to come down out of the rafters after removing three or four 20-foot sections of the old, deteriorated duct. Martin was the first to come down and did so by sliding down a rope strung from one of the rafters. Martin stepped upon the framework of the paper machine hood where he alighted from the rope and then stepped onto the "square-to-round" sheet metal transition duct which was connected to the hood. He then swung a leg over a crane rail and again stood on the square-to-round transition duct. At this point, the square-to-round transition duct was connected to a fan housing. Martin's next step was onto the top of the fan housing. The housing did not support his weight. His foot and leg went into the housing, and he came into contact with the revolving fan, receiving the injuries for which he sues.

At his pretrial deposition, Martin denied that he looked at the fan housing before he stepped on it. At trial he conceded that he "glanced" at the fan housing before he stepped. From the photographic evidence admitted, the jury could conclude that one who looked at the fan housing would have seen discolored and rusted metal and areas where the metal had rusted through completely.

Martin admitted that he was familiar with paper mills and that he knew that duct work and other metal structures in mills rusted out and needed replacement periodically.

■ Unless there is evidence from which a jury could find *both* that (1) Martin appreciated the danger or risk involved and (2) that he voluntarily exposed himself to it, it was error for the trial judge to have submitted a volenti instruction to the jury. On the other hand, it would have been error to have taken the issue from the jury if there were such evidence. *Detrick v. Garretson Packing Co.,* 73 Wn.2d 804, 440 P.2d 834 (1968).

Martin concedes that submitting a contributory negligence instruction was proper. He admits that the evidence could support a finding that he should have appreciated the risk. But he contends that there is no evidence or reasonable inference therefrom which would permit a finding that he voluntarily exposed himself to a known and appreciated specific hazard.

█ Does the evidence permit a finding that Martin in fact appreciated the danger? Martin testified that he did not know of the risk. But the trier of fact is not bound to accept his testimony. See W. Prosser, Torts 462 (3d ed. 1964). If Martin's testimony is to be rejected, however, there must be evidence from which the jury could find not merely that he *should* have known of the danger but that he in fact *did* know.[2] The inquiry, then, concerns Martin's state of mind. *Kingwell v. Hart,* 45 Wn.2d 401, 275 P.2d 431 (1954).

We conclude, as did the trial judge, that there was evidence from which the jury could find that Martin voluntarily exposed himself to a known risk. He was an experienced sheet metal worker. He knew that sheet metal duct work was not designed to carry foot traffic. He knew that sheet metal in paper mills undergoes stages of rust and

---

[2]In the recent case *Regan v. Seattle,* 76 Wn.2d 501, 458 P.2d 12 (1969), the Supreme Court might be understood to have held that a plaintiff's claim may be denied under the volenti doctrine if he knew *or should have known* of the risk. In discussing the applicability of the volenti doctrine the court spoke of "an extraordinary risk not assumed by plaintiff unless he knew *or should have known* of it." (Italics ours.) *Regan,* 76 Wn.2d at 508. We do not consider that the volenti doctrine in this state has now been broadened to apply to instances in which the plaintiff should have known of the risk but actually did not. For in a still more recent case, *Hogenson v. Service Armament Co.,* 77 W.D.2d 209, 214, 461 P.2d 311 (1969), the Supreme Court described the applicability of the volenti defense with these words:

The inquiry is whether the risk is known and appreciated and, if so, did the plaintiff voluntarily consent to expose himself to it. . . . [B]efore [a volenti instruction] can properly be submitted to the jury there must be at least some evidence introduced indicating that the plaintiff knew of the specific character of the risk, which if known might have caused him to reevaluate his voluntarily entering into the risk-creating situation.

deterioration. He was warned of danger in the area he chose to traverse. He saw that the angle iron framework of the hood of the paper machine was rusted, but he nevertheless risked walking on it. It bore his weight. He saw the fan housing before he stepped on it. When he stepped on it, it collapsed. The jury could believe that he saw that it, too, was rusted and deteriorated but that he elected to chance the step rather than follow a safer but more circuitous route to the floor. The defense of volenti non fit injuria was properly submitted.

■ Martin also assigns error to the giving of instruction 15, which, in effect, told the jury that Weyerhaeuser would not be liable for any injury which Martin sustained by reason of his using any portion of the premises for a purpose for which it was not intended to be used, "except as to specific uses the owner should have reasonably anticipated." However, Martin has not directed our attention, either in his brief or at oral argument, to any authority in support of his assertion that the instruction is incorrect. Unless a legal assertion is meritorious on its face, an appellate court will not consider it if no authorities are cited in support of it. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 372 P.2d 193 (1962); *Myers v. Harter*, 76 Wn.2d 772, 459 P.2d 25 (1969). Martin's contention that instruction 15 is erroneous is not meritorious on its face. We will not consider his argument further.

In view of our conclusion that Martin's assignments of error are without merit, Weyerhaeuser's cross appeal need not be considered.

The judgment is affirmed.

FARRIS and SWANSON, JJ., concur.