A. C. SIMPSON, *as Guardian, Appellant,* v. CHARLES E. MAY *et al., Respondents.*

*Leo C. Kendrick* (of *Gavin, Robinson, Kendrick, Redman & Mays*), for appellant.

*Terry A. Brooks* (of *Nashem, Prediletto & Brooks*), for respondents.

EVANS, J.—Plaintiff A. C. Simpson, as guardian ad litem for D. Bruce Simpson, a minor, brought this action to recover damages for a permanent eye injury received by Bruce while engaged with friends in throwing cattail heads at each other. This appeal stems from an order of the trial court granting defendants' motion for nonsuit and dismissal

with prejudice. The order was based upon a determination by the trial court that Bruce Simpson assumed the risk of being injured by voluntarily participating in the cattail throwing activities with knowledge of the risk involved, and was therefore barred from recovery.

The facts are not in dispute. Bruce Simpson, age 16½, a close friend and classmate of Jim May, son of defendant Charles May, was invited by Jim May to join him and his family, consisting of his mother, father, three brothers and his sister on a weekend water-skiing trip to the Priest Rapids Dam area. Also joining the May family at the ski site were relatives, Mr. and Mrs. Dawson and their four children. The Mays with their boat and their guest, Bruce Simpson, drove to the dam area in the Mays' automobile, arriving at approximately 11 a.m. The Dawsons with their boat and pickup camper came along later in the day.

Sometime during the afternoon, Bruce Simpson and Jim May, using two air mattresses, paddled to an island offshore. While on the island they picked a number of cattail heads which they floated back to shore on the air mattresses. Later the boys put some cattail heads in their swim trunks and threw them at each other while skiing tandem behind the May boat. No one was struck by the cattails during this "game".

About 5 p.m. Saturday the throwing of cattails broke out again among Mr. Charles Dawson, three of the girls, Jim May and Bruce Simpson. The principal participants were the two boys and Mr. Dawson. Jim May and Mr. Dawson were approximately 3 to 5 feet apart, and in turn separated from Bruce Simpson by 40 to 45 feet, all in shallow water. The cattails were not being thrown "very hard" according to Jim May. Both Mr. Dawson and his nephew were throwing at Bruce when he was hit in the eye by a cattail thrown by one of them. The lively exchange of cattails had been going on about 15 minutes and Mr. Dawson had been actively participating for about 5 minutes when Bruce was hit. Jim's father, Charles May, was watching the exchange from the shore but did not see anyone get hit. He likened

the cattail exchange to a snowball fight, with everybody running around and having a lot of fun. Bruce testified that he was laughing, yelling and teasing Jim May.

Plaintiff's right-eye injury occurred when a piece of a cattail head struck him on the eyelid as he straightened up after turning to pick up a cattail from the water. He had seen it in time to shut his eye but not in time to move his head or get out of the way. The cattail heads, when picked by Bruce Simpson and Jim May were 5 to 6 inches long and 1½ to 2 inches in diameter. They were fairly firm and brown in color. By the time the injury occurred the cattail heads had been broken into small pieces which, although waterlogged, were solid enough to float. Water would spray from them when thrown. Many of the pieces had so much water in them that when thrown they would come apart when they hit the water.

Plaintiff first contends that the defense of "volenti" has been abolished. He argues that the doctrine of "volenti non fit injuria" and that of "assumption of risk" are identical in legal philosophy (literally—no injury is done to one who consents); *Ewer v. Johnson*, 44 Wn.2d 746, 758, 270 P.2d 813 (1954); the Supreme Court in *Siragusa v. Swedish Hosp.*, 60 Wn.2d 310, 373 P.2d 767 (1962) abolished the defense of "assumption of risk", and contends the demise of the companion doctrine of "volenti non fit injuria" came with the decision in *Carabba v. Anacortes School Dist. 103*, 72 Wn.2d 939, 435 P.2d 936 (1967). We cannot agree with this contention. *Carabba* involved voluntary participation in a high school wrestling match, in which one of the participants was injured as a result of the alleged negligence of the school district in (1) failing to adequately supervise the contestants, (2) allowing the referee's attention to be diverted from the actions of the contestants, (3) allowing an illegal and dangerous hold to be applied, (4) failing to immediately cause the said hold to be broken, (5) allowing the said hold to be prolonged for a substantial period of time, and (6) violating the provisions of the 1963 official

Wrestling Guide of the National Collegiate Athletic Association.

The trial court refused to submit to the jury the issue of volenti non fit injuria. The sole comment by the Supreme Court regarding the defense of volenti was at page 958:

> However, we must agree with the trial court that one is never held to "assume the risk" of another's negligence or incompetence. The doctrine is inapplicable and the trial court did not err in refusing to submit the issue to the jury.

We do not find this ruling inconsistent with subsequent decisions of the Supreme Court which, while recognizing the doctrine of volenti, hold that it does not apply in cases where the injury to plaintiff results from an *extraordinary* risk of which plaintiff could not have knowledge or appreciation. *Regan v. Seattle*, 76 Wn.2d 501, 458 P.2d 12 (1969); *Hogenson v. Service Armament Co.*, 77 Wn.2d 209, 461 P.2d 311 (1969). On the other hand, since *Carabba* both the Supreme Court and the Court of Appeals have not only recognized the defense of "volenti" but approved its application. *See Detrick v. Garretson Packing Co.*, 73 Wn.2d 804, 440 P.2d 834 (1968); *Martin v. Weyerhaeuser Co.*, 1 Wn. App. 463, 462 P.2d 981 (1969); and *Stark v. Allis-Chalmers & Northwest Roads, Inc.*, 2 Wn. App. 399, 467 P.2d 854 (1970). We conclude the defense of "volenti" has not yet been abolished in this state.

The elements which must be established before the defense of volenti non fit injuria applies are set forth in *Martin v. Kidwiler*, 71 Wn.2d 47, 49, 426 P.2d 489 (1967), as follows:

> The volenti non fit injuria maxim requires that two questions be answered in the affirmative in order that this defense be validly established. Those questions are: "Did plaintiff (1) know of and appreciate the danger or risk involved, and also (2) did he voluntarily consent to expose himself to it . . . ." *Kingwell v. Hart*, 45 Wn.2d 401, 405, 275 P.2d 431 (1954). See also *Handler v. Osman*, 60 Wn.2d 800, 376 P.2d 439 (1962).

Thus, the inquiry is whether the risk is known and ap-

preciated, and if so, did the plaintiff voluntarily consent to expose himself to it. The burden of proof is upon the defendant to establish the elements of defense. Whether he has successfully done so is normally a question for the jury. *Hogenson v. Service Armament Co., supra,* at 214.

In ruling as a matter of law that the defense of volenti applied in the instant case the trial court was required to consider the evidence in the light most favorable to plaintiff and find that reasonable minds could not differ that plaintiff voluntarily exposed himself to a known risk. *Owens v. Young,* 59 Wn.2d 30, 365 P.2d 774 (1961); *Detrick v. Garretson Packing Co., supra.*

Can reasonable minds differ as to whether the risk involved in throwing cattail heads was known and appreciated by Bruce Simpson? As stated in *Hogenson v. Service Armament Co., supra,* at 215:

> However, before it can properly be submitted to the jury there must be at least some evidence introduced indicating that the plaintiff knew of the specific character of the risk, which if known might have caused him to reevaluate his voluntarily entering into the risk-creating situation. In other words, the defense requires more than a generalized feeling that there may be some hazard involved. To illustrate, one who attends a baseball game may be precluded from recovering for damages suffered when hit by a ball or broken bat. *See, e.g., Kavafian v. Seattle Baseball Club Ass'n,* 105 Wash. 215, 177 P.776, 181 P.679 (1919). This preclusion may apply even if the circumstances leading to the injury were somewhat bizarre. He would not be precluded from recovering for damages from a collapsing grandstand or from eating tainted concession food unless he knew of this specific risk and voluntarily accepted these risks.

Although the standard in determining whether the plaintiff knew and understood the risk is a subjective one, there are certain instances when the trial court is correct in directing a verdict:

> "Knowledge of the risk is the watchword of assumption of risk." Under ordinary circumstances the plaintiff will not be taken to assume any risk of either activities or conditions of which he is ignorant. Furthermore, he

must not only know of the facts which create the danger, but he must comprehend and appreciate the danger itself. "A defect and the danger arising from it are not necessarily to be identified, and a person may know of one without appreciating the other." The standard to be applied is, in theory at least, a subjective one, geared to the particular plaintiff and his situation, rather than that of the reasonable man of ordinary prudence who appears in contributory negligence. If because of age or lack of information or experience, he does not comprehend the risk involved in a known situation, he will not be taken to consent to assume it. His failure to exercise ordinary care to discover the danger is not properly a matter of assumption of risk, but of the defense of contributory negligence.

At the same time, it is evident that a purely subjective standard opens a very wide door for the plaintiff who is willing to testify that he did not know or understand the risk; and there have been a good many cases in which the courts have said in effect that he is not to be believed, so that in effect something of an objective element enters the case, and the standard applied in fact does not differ greatly from that of the reasonable man. *The plaintiff will not be heard to say that he did not comprehend a risk which must have been quite clear and obvious to him.*

W. Prosser, The Law of Torts at 462 (3d ed. 1964). (Italics ours.) *See, also, Kavafian v. Seattle Baseball Club Ass'n,* 105 Wash. 215, 177 P. 776 (1919), *on rehearing* 105 Wash. 219, 181 P. 679 (1919); Restatement of Torts (Second) § 496 D and comment *d* (1965); 2 F. Harper & F. James, The Law of Torts § 21.2 at 1168 (1956).

In the same vein as the above is *Bailey v. Safeway Stores, Inc.,* 55 Wn.2d 728, 349 P.2d 1077 (1960). This was an action for personal injuries which resulted when a 77-year-old plaintiff fell into an open trench adjacent to a sidewalk in the rear of her apartment house. The trial court granted a defense motion challenging the sufficiency of the evidence under the "volenti" maxim, and in affirming the Supreme Court stated, at page 732:

The appellant appears to come clearly within the maxim *volenti non fit injuria.* She voluntarily exposed

herself to the danger of walking along the sidewalk near the open unguarded ditch with the knowledge of her physical infirmity. The risk or danger of falling into the excavation when walking near the edge, by placing her cane on obvious soft and insecure ground instead of the sidewalk, in view of her infirmity, was so obvious that she must be presumed to have comprehended it.

*See, also, Walsh v. West Coast Coal Mines*, 31 Wn.2d 396, 197 P.2d 233 (1948). Although a case of intentional tort, *Hellriegel v. Tholl*, 69 Wn.2d 97, 417 P.2d 362 (1966) also dealt with the concept of knowledge and consent. In *Hellriegel* plaintiff brought suit alleging that he was injured due to the negligence of defendants. Prior to trial, the complaint was amended so that plaintiff's action was based upon the intentional tort of battery. The facts of the case are not complex. The plaintiff, along with other companions, was spending an afternoon swimming and water-skiing. Someone in the crowd stated that they could throw plaintiff into the water. Plaintiff answered, "Oh, you couldn't throw me in if you tried." The three defendants took up plaintiff's challenge and began to carry him to the water's edge. In the struggle that ensued plaintiff was injured. On appeal the question before the court was whether the trial court was correct in granting a nonsuit based upon a finding that plaintiff had consented to offensive touching so as to constitute a defense to the battery. The court, in affirming the nonsuit, stated at page 103:

First, with regard to the significance of Dicka's words and actions, we agree with the trial court that his words were an invitation to respondents to try to throw him into the water if they thought they could. His statement to them (quoted above) constituted a consent that the boys could *try* to throw him into the lake (as distinguished from a consent to being thrown into the lake) and he thereby assumed the risk that he might be accidentally injured during the horseplay that necessarily would result from their attempt to throw him into the lake and his resistance to such attempt. Even if what he said was in response to someone's statement to the effect "Let's throw Dicka into the lake," his words were an invitation to try, as distinguished from a warning to the

other boys *not* to try to throw him in because he did not want to be thrown in and would resist.

And at page 105 the court further stated:

The invasion consented to in this instance, as we stated earlier, was rough and tumble horseplay. The question which § 53 of the restatement does not answer is, who takes the risk of injury which may accidentally result from such rough and tumble play? It seems to us that rough and tumble play is like an informal boxing match, which is described in *Comment b* above. The boxer accepts the risk of serious injuries from the blows received. See *McAdams v. Windham*, 208 Ala. 492, 94 So. 742, 30 A.L.R. 194 (1922). *Persons who engage in roughhouse horseplay also accept the risk of accidental injuries which result from participation therein.*

(Italics ours.)

We consider it of significance that the court used the phrase "accepted the risk" when discussing the concept of consent as a defense to an intentional tort. In this regard, Prosser, *supra,* at 450 has stated:

In its simplest and primary sense, assumption of risk means that the plaintiff, in advance, has expressly given his consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or to leave undone. The situation is then the same as where the plaintiff consents to the infliction of what would otherwise be an intentional tort, except that the consent is to run the risk of unintended injury, to take a chance, rather than a matter of the greater certainty of intended harm. The result is that the defendant is relieved of all legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence.

*See, also,* Restatement of Torts (Second) § 496A comment *c* 2.

In the present case, the obvious purpose of those engaged in the "game" was to hit each other with a cattail head. The risk reasonably to be expected by any of the participants was the risk of being struck. There is no showing that when plaintiff was injured the cattail heads were being thrown in any different manner than on prior occa-

sions, or that the "rules of the game", if any, were in any manner ignored or altered. The fact that he was struck in the eye rather than on some other part of his body, resulting in serious injury, does not change the nature of the risk to be expected—namely, the risk of being struck by a cat-tail head. We are of the opinion reasonable minds cannot differ that the risk of being struck did not constitute an extraordinary risk within the meaning of *Regan, Hogenson* and *Carabba*. On the contrary, the risk was so obvious that all those voluntarily participating, including Bruce, must be presumed to have comprehended it.

Judgment affirmed.

MUNSON, C.J., and GREEN, J., concur.

Petition for rehearing denied July 28, 1971.

Review denied by Supreme Court August 26, 1971.

[No. 211-3.   Division Three.   July 2, 1971.]