**John J. RUNNINGS, Plaintiff-Appellant,**

v.

**FORD MOTOR COMPANY, a Michigan corporation, Defendant-Appellee.**

**No. 71-1555.**

United States Court of Appeals, Ninth Circuit.

May 30, 1972.

Rehearing Denied July 24, 1972.

**1146** 

Ralph D. Pittle (argued), Danie¹ F. Sullivan, Uhlman, Callies, Flynn & Sullivan, Seattle, Wash., for plaintiff-appellant.

H. Roland Hofstedt (argued), of Merrick, Hofstedt, Schuman & Lindsay, Seattle, Wash., for defendant-appellee.

Before HAMLEY, HUFSTEDLER and GOODWIN, Circuit Judges.

HAMLEY, Circuit Judge:

John J. Runnings brought this diversity suit, arising in the State of Washington, against Ford Motor Company to recover damages for personal injuries suffered as the result of an alleged design defect in a 1961 Ford Econoline van. The case was tried to a jury. At the close of all the evidence defendant moved to dismiss the action. The trial court granted the motion and dismissed the action with prejudice. Runnings appeals. We reverse.

We first summarize the evidence, viewed in the light most favorable to plaintiff. On August 8, 1966, while driving the Ford vehicle, with his wife, minor son and daughter as passengers, Runnings noticed that the gauges indicated that the engine was overheated. He therefore pulled the vehicle into a service station. Runnings and his son then ran cold water on the whole of the radiator to cool it before attempting to remove the radiator's conventional cap.

On this particular model, the engine and radiator cap are located under a removable hood inside the cab between the driver's seat and the passenger's seat. The hood can be removed and the radiator cap taken off either while one remains seated in the cab, or by reaching in from the outside, but it is much easier to reach the cap from the inside. On the occasion in question Runnings decided to stay within the cab while removing the radiator cap after the hood had been removed and cold water had been run on the radiator. Sitting in the driver's seat with the door closed, he reached down with his right hand, turned the radiator cap partially counterclockwise, paused for a few seconds, and then continued to turn the cap. The cap suddenly "exploded," blowing straight up and allowing saturated steam to escape and strike the top of the cab. The steam, on contact with the cab ceiling turned into boiling water and fell upon the person of plaintiff, causing severe burns about his head and torso down to his waist.

Runnings had owned the vehicle for about a year. He testified that it had overheated on previous occasions and there had been no difficulty when the radiator cap had been removed. Runnings was aware of how a conventional radiator cap operates and that, if the cap is suddenly removed when the radiator is overheated, steam and hot water may escape. There was no evidence, however, to indicate that Runnings realized the additional hazard presented by the placement of the radiator cap within the enclosed cab, namely that the steam

would turn to scalding water on contact with the cab ceiling and thereafter fall upon a person inside the cab.

■ Since there was a jury trial, defendant's motion to dismiss must be regarded as a motion for directed verdict, made pursuant to Rule 50(a), F.R.Civ.P. *See* P. S. G. Co. v. Merrill Lynch, 417 F.2d 659, 661, n. 4 (9th Cir. 1969). On such a motion the question before the trial court is whether the evidence in its entirety would rationally support a verdict for the plaintiff, assuming the jury took a view of the evidence most favorable to plaintiff. McCollum v. Smith, 339 F.2d 348, 349 (9th Cir. 1964). On appeal plaintiff argues that the evidence was sufficient to support a verdict in his favor and that the trial court therefore erred in taking the case from the jury.

■ Plaintiff produced substantial evidence tending to show that the placement of the radiator cap within the cab of the vehicle so that it could most conveniently be removed by one seated in the cab, and so that saturated steam escaping from the radiator could turn to scalding water in the enclosed cab, created a foreseeable hazard that could reasonably have been avoided.[1]

■ Apart from possible defenses, this was enough to take the case to the jury. Washington follows the rule of strict liability, as set out in Section 402

A, Restatement (Second) of Torts. (1965). *See* Ulmer v. Ford Motor Company, 75 Wash.2d 522, 452 P.2d 729 (1969). Defective design is a basis of strict manufacturer's liability. Palmer v. Massey-Ferguson, Inc., 3 Wash.App. 508, 476 P.2d 713 (1970).

The trial court agreed that the design was defective "if you are willing to sit there and do it that way." The court ruled, however, that one who knows of the defect in design and has a reasonable alternative course to avoid the danger inherent in such design, may not recover damages by reason of defective design. The court held that, since Runnings knew where the radiator cap was placed, he knew of the defective design and could have followed a reasonable alternative course by getting out of the cab and reaching in to unscrew the cap. In essence, this was a determination, as a matter of law, that Runnings' recovery was barred by the doctrine expressed in the maxim "volenti non fit injuria."

■ The volenti doctrine, when proper facts are proven, is an adequate defense in such a case. *See* Simpson v. May, 5 Wash.App. 214, 486 P.2d 336 (1971).[2] However, two questions must be answered in the affirmative before the volenti defense can bar recovery. These questions are: (1) did plaintiff know of and appreciate the danger of

---

1. Thus, with respect to the asserted defective design of the vehicle, it is not necessary to consider the substantiality of the evidence tending to show that the cap itself was defectively designed because it did not contain a release lever. Nor is it necessary to consider the evidence tending to show that the danger could have been minimized by the posting of a warning near the radiator cap advising of the hazard involved in removing the cap of an overheated radiator while seated in the cab.

2. The "volenti non fit injuria" defense is closely related to the doctrine of assumption of risk. Hogenson v. Service Armament Co., 77 Wash.2d 209, 461 P.2d 311, 314–315 (1969). The assumption of risk defense is applicable in product liability cases. Stark v. Allis-Chalmers and Northwest Roads, Inc., 2 Wash.App. 399,

467 P.2d 854, 856 (1970). Therefore, we think the Washington courts would apply the volenti doctrine in a product liability or defective design case such as the present one.

We note that, although similar, assumption of risk and the volenti doctrine form distinct defenses in Washington. As explained in *Hogenson, supra,* 461 P.2d at 315, n. 2, assumption of risk retains validity in Washington when there is an express voluntary agreement to assume a known risk, while volenti applies in a case where the risk is known to the actor but the voluntary assumption must be implied from the circumstances. We think the distinction immaterial as respects the question of whether the volenti doctrine should, like assumption of risk, be applied in the product liability or defective design areas.

risk involved; and (2) did he voluntarily consent to expose himself to it?[3] The burden of proof in answering these questions is upon the defendant seeking to establish the volenti defense. *Hogenson v. Service Armament Co.,* 77 Wash. 2d 209, 461 P.2d 311, 315 (1969).

The standards to be used in answering the first of the above questions have also been explained and clarified by the Washington courts. First, evidence that the plaintiff was aware of a generalized risk concomitant to his activities is not enough to establish the defense; there must be proof that the plaintiff knew of and appreciated the specific hazard which caused the injury. *Hogenson, supra,* 461 P.2d at 315, *and cases there cited; Martin v. v. Kidwiler,* 71 Wash.2d 47, 426 P.2d 489, 491–492 (1967) *and cases there cited.*

Second, the question of whether plaintiff knew of and appreciated the danger or risk involved is primarily a subjective one, and has reference to the plaintiff's own state of mind. *Simpson v. May, supra,* 486 P.2d at 339.

 In the present case, the record shows that Runnings was aware of the general risk of hot steam escaping from an overheated radiator. This is quite different, however, from a realization that the steam could turn to scalding water upon contact with the cab ceiling, and thereafter fall to injure an occupant of the cab. There is no evidence that Runnings appreciated this specific hazard. *Compare* the facts of *Hogenson* and *Martin, both supra,* to those of the present case. *See also* Regan v. City of Seattle, 76 Wash.2d 501, 458 P.2d 12, 16 (1969).

It is true, as stated in Simpson v. May, *supra,* that the use of such a specific and subjective standard "opens a very wide door for the plaintiff who is willing to testify that he did not know or understand the risk; . . ." 486 P.2d at 339. *Simpson* demonstrates that there are times when a trial court can direct a verdict for the defendant despite plaintiff's testimony on the theory that the plaintiff ". . . *will not be heard to say that he did not comprehend a risk which must have been quite obvious to him."* 486 P.2d at 339 (emphasis in original).

In *Simpson,* the plaintiff was injured while engaging in throwing cattail heads with friends. Our examination of Washington case law persuades us that *Simpson* represents the exceptional case, and that the facts in the case at bar place it under the more general doctrine applied in *Hogenson* and Martin v. Kidwiler, *both supra.*

Reversed and remanded for a new trial.[4]

---

3. Hogenson v. Service Armament Co., 77 Wash.2d 209, 461 P.2d 311, 315 (1969); Martin v. Kidwiler, 71 Wash.2d 47, 49, 426 P.2d 489, 491 (1967); Simpson v. May, *supra,* 486 P.2d at 338.

4. This case once again demonstrates the desirability of withholding action on motions for directed verdicts and permitting

the jury to reach a verdict. Thereafter, the movant may move for a judgment n. o. v. under Rule 50(b), F.R.Civ.P. If the judgment n. o. v. is erroneously granted, a reversal on appeal merely reinstates the verdict. But where a motion for directed verdict is erroneously granted, there must be a new trial.