929 P.2d 420 (1996)
131 Wash.2d 39
Dory NIECE, as Guardian for her daughter Lori Ann Niece, Petitioner,
v.
ELMVIEW GROUP HOME, a corporation, Respondent/Cross Petitioner, and
Kleber V. Quebedo, a/k/a Kleber Quevedo; Bruce A. Herman, M.D.; and State of Washington, Defendants.
No. 63596-0.
Supreme Court of Washington, En Banc.
Argued June 12, 1996.
Decided January 16, 1997.
*422 Bryan P. Harnetiaux, Debra Stephens, Spokane, Harbaugh & Bloom, Gary Bloom, Spokane, Amicus Curiae on behalf of Washington State Trial Lawyers Association.
Paine, Hamblen, Coffin, Brooke & Miller, Mary M. Palmer, Spokane, Amicus Curiae on behalf of Washington Defense Trial Lawyers.
John H. Moore, Jr., Yakima, Moore & Thompson, David Thompson, Yakima, Theodore Spearman, Bainbridge, for Petitioner.
Merrick, Hofstedt & Lindsey, Nancy K. McCoid, Allan H. Baris, Harold R. Hofstedt, Seattle, for Respondent.
*421 DURHAM, Chief Justice.
A developmentally disabled woman brought this action for damages against a private group home after she was sexually assaulted by a staff member at the home. We are asked to determine the tort theories under which a group home for developmentally disabled persons may be liable for such assaults. We hold that (1) the special relationship between the group home and its vulnerable residents gives rise to a duty of reasonable care, owed by the group home to its residents, to protect the residents from all foreseeable harms, and (2) sexual assault by a staff member is not a legally unforeseeable harm.
Our recognition of this tort duty makes it unnecessary to determine the precise boundaries of a cause of action based on the theory of negligent supervision. We also decline the invitation to adopt a more expansive "nondelegable duty" theory of vicarious liability announced in a recent Indiana case, Stropes v. Heritage House Childrens Ctr., 547 N.E.2d 244 (Ind.1989). This theory would impose essentially strict liability for an employee's intentional or criminal conduct. We are unable to determine the public policy consequences of such a major change in Washington employer liability and therefore *423 reserve such considerations of public policy for the Legislature.

HISTORY
Lori Niece suffers from cerebral palsy and has profound developmental disabilities including difficulty with mobility and communication. She has the mental abilities of a very young child. Since 1986, Niece has been a resident at Elmview Group Home, a licensed private provider of residential care for persons with developmental disabilities.
Niece was sexually assaulted on more than one occasion by an Elmview employee, Kleber Quevedo. Prior to the discovery of Quevedo's assaults, Elmview had no knowledge of his dangerous propensities. Quevedo had no criminal history and had received favorable references from another group home where he had previously worked.
At the time of the assaults, Quevedo was the only Elmview staff member on duty. Elmview previously had a policy against male staff members being left alone with female residents. This policy, adopted in response to prior sexual assaults on residents by another Elmview employee, was intended to protect both staff and residents. By the time of Quevedo's assaults on Niece, Elmview had abandoned this policy. Niece's expert, the former medical director of a large public facility for developmentally disabled persons, opined that permitting such unsupervised contact with residents violated the standard of care for group homes with disabled residents.
Niece pursues this action against Elmview under several tort theories. Niece alleges that (1) Elmview breached its duty to protect her from foreseeable harms, (2) Elmview had been negligent in its supervision of Quevedo, and (3) Elmview was vicariously liable for Quevedo's actions, even though he was not acting within the scope of employment, due to Elmview's nondelegable duty to protect its residents. The trial court dismissed all of Niece's claims.
The Court of Appeals affirmed the dismissal of Niece's claims for negligent supervision and vicarious liability. The Court of Appeals reversed the dismissal of Niece's negligence claim and held that Elmview had a duty to protect Niece from foreseeable harms including sexual assaults by staff. Niece v. Elmview Group Home, 79 Wash.App. 660, 668-69, 904 P.2d 784 (1995). We granted both parties' petitions for review.

PROTECTIVE SPECIAL RELATIONSHIP
As a general rule, there is no duty to prevent a third party from intentionally harming another unless "`a special relationship exists between the defendant and either the third party or the foreseeable victim of the third party's conduct.'" Hutchins v. 1001 Fourth Ave. Assocs., 116 Wash.2d 217, 227, 802 P.2d 1360 (1991) (quoting Petersen v. State, 100 Wash.2d 421, 426, 671 P.2d 230 (1983)); Lauritzen v. Lauritzen, 74 Wash. App. 432, 438-39, 874 P.2d 861, review denied, 125 Wash.2d 1006, 886 P.2d 1134 (1994). A duty arises where:
(a) a special relation exists between the [defendant] and the third person which imposes a duty upon the [defendant] to control the third person's conduct, or
(b) a special relation exists between the [defendant] and the other which gives the other a right to protection.
Petersen, 100 Wash.2d at 426, 671 P.2d 230 (quoting Restatement (Second) of Torts § 315 (1965)). Niece's negligence claims are based on both types of special relationship. Niece's negligent supervision claim (discussed in the next section) is based on the relationship between Elmview and its employee Quevedo. Niece's claim for Elmview's negligent failure to protect her is based on the relationship between Niece and Elmview.
Many special relationships give rise to a duty to prevent harms caused by the intentional or criminal conduct of third parties. For example, a school has a duty to protect students in its custody from reasonably anticipated dangers. McLeod v. Grant County Sch. Dist. No. 128, 42 Wash.2d 316, 320, 255 P.2d 360 (1953). See also J.N. ex rel. Hager v. Bellingham Sch. Dist. No. 501, 74 Wash.App. 49, 871 P.2d 1106 (1994); Briscoe v. School Dist. No. 123, 32 Wash.2d 353, 201 P.2d 697 (1949). The rationale for such a dutythe placement of the student in the *424 care of the defendant with the resulting loss of the student's ability to protect himself or herselfis also the basis for the similar duty of an innkeeper to protect guests from the criminal actions of third parties. Hutchins, 116 Wash.2d at 228, 802 P.2d 1360 (citing Joseph A. Page, Premises Liability § 11.2, at 292 (2d ed.1988)).
Other relationships falling into the general group of cases where the defendant has a special relationship with the victim are also protective in nature, historically involving an affirmative duty to render aid. The defendant may therefore be required to guard his or her charge against harm from others. Thus a duty may be owed from a carrier to its passenger, from an employer to an employee, from a hospital to a patient, and from a business establishment to a customer.
Hutchins, 116 Wash.2d at 228, 802 P.2d 1360 (citing W. Page Keeton et al., Prosser and Keeton on Torts § 56, at 383 (5th ed.1984)).[1]
The special relationship which is most analogous to the relationship at issue here is the relationship between a hospital and its patients. In Hunt v. King County, 4 Wash. App. 14, 481 P.2d 593, review denied, 79 Wash.2d 1001 (1971), a disturbed and suicidal patient was admitted to the psychiatric ward of a county hospital. The patient was injured when he found an open window and jumped five stories to the ground. The Court of Appeals held that the hospital owed the patient a duty of care which included a "duty to safeguard the patient from the reasonably foreseeable risk of self-inflicted harm through escape." Hunt, 4 Wash.App. at 20, 481 P.2d 593.
In Shepard v. Mielke, 75 Wash.App. 201, 205, 877 P.2d 220 (1994), the Court of Appeals recognized that a convalescent center had a general duty to protect its vulnerable residents. The plaintiff in Shepard had suffered brain damage and was entrusted to Manor Care, a convalescent center, where she was sexually assaulted by a visitor. The Court of Appeals observed that
Ms. Shepard could not lock her door, screen visitors, or generally provide for her own safety. She was in Manor Care precisely because she was unable to perform these tasks for herself. Manor Care, like other nursing homes, holds itself out to the public as willing and able to provide these services, for a fee.
Shepard, 75 Wash.App. at 205-06, 877 P.2d 220. As a result, the convalescent home owed its resident a duty to protect her from reasonably foreseeable risks of harm, including criminal actions by visitors.
Following Shepard, the Court of Appeals in the present case recognized the special relationship between a group home and its highly vulnerable residents. "[A] nursing home's function is `to provide care for those who are unable because of physical or mental impairment to provide care for themselves.'" Niece, 79 Wash.App. at 668-69, 904 P.2d 784 (quoting Shepard, 75 Wash.App. at 205, 877 P.2d 220). Consequently, Elmview had a duty to take reasonable precautions to protect Niece from the foreseeable consequences of her impairments, including possible sexual assaults by staff.[2]
*425 The special relationship between Elmview and its vulnerable residents is perhaps more significant, for purposes of Elmview's duty of care, than the recognized special relationships between a common carrier and its passengers or between a hotel and its guests. As noted earlier, these special tort duties are based on the liable party's assumption of responsibility for the safety of another. See Lauritzen, 74 Wash.App. at 440, 874 P.2d 861. Passengers and hotel guests are merely away from familiar surroundings and relying on their hosts to take the same reasonable precautions that they would take at home. Profoundly disabled persons are totally unable to protect themselves and are thus completely dependent on their caregivers for their personal safety.[3]
Elmview urged the Court of Appeals to limit the duty recognized in Shepard to provide protection from outsiders but not from staff. The Court of Appeals properly rejected this argument, recognizing that a group home for developmentally disabled persons has a duty to protect its residents from all foreseeable harms.[4] As the Court of Appeals pointed out, residents of group homes are more vulnerable to abuse by staff than by visitors or other third parties. "Staff members have greater access to nursing home residents than the general public." Niece, 79 Wash.App. at 669, 904 P.2d 784. If hospitals and group homes have a duty to protect their vulnerable residents from visitors (Shepard) and from themselves (Hunt), then they also have a duty to protect their residents from the harm against which they are least able to protect themselvesabuse at the hands of staff.
Other liability theories distinguished:
Elmview attempts to limit its duty of care by blurring the essential analytical distinction between its duty of care as Niece's custodial care provider and its liability as Quevedo's employer. Elmview suggests that it cannot be liable for Quevedo's actions outside the scope of employment. Cases relied on by Elmview establish that employers are not vicariously liable for the actions of their employees which are outside the scope of employment.[5] However, Elmview's negligence liability for its failure to protect its vulnerable residents from abuse by staff is not vicarious liability and the cited cases are thus inapplicable.
Vicarious liability, otherwise known as the doctrine of respondeat superior, imposes liability on an employer for the torts of *426 an employee who is acting on the employer's behalf. Where the employee steps aside from the employer's purposes in order to pursue a personal objective of the employee, the employer is not vicariously liable. Kuehn v. White, 24 Wash.App. 274, 277, 600 P.2d 679 (1979). Whether or not the employer has any particular relationship to the victim of the employee's negligence or intentional wrongdoing, the scope of employment limits the employer's vicarious liability. However, the scope of employment is not a limit on an employer's liability for a breach of its own duty of care.
Even where an employee is acting outside the scope of employment, the relationship between employer and employee gives rise to a limited duty, owed by an employer to foreseeable victims, to prevent the tasks, premises, or instrumentalities entrusted to an employee from endangering others. This duty gives rise to causes of action for negligent hiring, retention and supervision. Liability under these theories is analytically distinct and separate from vicarious liability. These causes of action are based on the theory that "such negligence on the part of the employer is a wrong to [the injured party], entirely independent of the liability of the employer under the doctrine of respondeat superior." Scott v. Blanchet High Sch., 50 Wash.App. 37, 43, 747 P.2d 1124 (1987) (quoting 53 Am.Jur.2d Master and Servant § 422 (1970)), review denied, 110 Wash.2d 1016 (1988).
Washington cases have generally held that an employer is not liable for negligent supervision of an employee unless the employer knew, or in the exercise of reasonable care should have known, that the employee presented a risk of danger to others. In Thompson v. Everett Clinic, 71 Wash.App. 548, 860 P.2d 1054 (1993), review denied, 123 Wash.2d 1027, 877 P.2d 694 (1994), the court found no evidence that the health clinic knew or should have known of a physician's inappropriate sexual conduct in treating patients. Thompson, 71 Wash.App. at 555, 860 P.2d 1054. In Peck v. Siau, 65 Wash.App. 285, 289-90, 827 P.2d 1108, review denied, 120 Wash.2d 1005, 838 P.2d 1142 (1992), there was no evidence that school district knew or should have known that a teacher constituted a danger to students. Elmview relies on Thompson and Peck, arguing that if the facts do not support a cause of action for negligently supervising Quevedo, Elmview is not liable for failing to protect Niece.[6]
This argument is based on an incorrect understanding of the duty that gives rise to a cause of action for negligent supervision of employees. The theory of liability for negligent supervision is based on the special relationship between employer and employee, not the relationship between group home and resident.[7] Cases like Thompson and Peck, which define the scope of an employer's duty to control its employees for the protection of third parties, do not inform the scope of the duty of care owed by Elmview to Niece by virtue of Elmview's special relationship to her. While an employer generally does not have a duty to guard against the possibility that one of its employees may be an undiscovered sexual predator, a group home for developmentally disabled persons has a duty to protect residents from such predators regardless of whether those predators are strangers, visitors, other residents, or employees.
The scope of Elmview's duty of care foreseeability:
The duty to protect another person from the intentional or criminal actions of third parties arises where one party is "entrusted with the well being of another." Lauritzen, 74 Wash.App. at 440, 874 P.2d 861. Given Niece's total inability to take care of herself, Elmview was responsible for *427 every aspect of her well being. This responsibility gives rise to a duty to protect Niece and other similarly vulnerable residents from a universe of possible harms. This duty is limited only by the concept of foreseeability. Christen v. Lee, 113 Wash.2d 479, 492, 780 P.2d 1307 (1989).
Given Elmview's duty to protect Niece from all foreseeable harms, the next issue is whether, as Elmview suggests, sexual assault was legally unforeseeable. Quevedo's assault was not legally unforeseeable as long as the possibility of sexual assaults on residents by staff was within the general field of danger which should have been anticipated. Shepard, 75 Wash.App. at 206, 877 P.2d 220 (citing Hansen v. Friend, 118 Wash.2d 476, 483-84, 824 P.2d 483 (1992)). Intentional or criminal conduct may be foreseeable unless it is "so highly extraordinary or improbable as to be wholly beyond the range of expectability." Johnson v. State, 77 Wash.App. 934, 942, 894 P.2d 1366 (sexual assault on dormitory resident on college campus), review denied, 127 Wash.2d 1020, 904 P.2d 299 (1995); Shepard, 75 Wash.App. at 206, 877 P.2d 220 (sexual assault on convalescent home resident); McLeod v. Grant County Sch. Dist. No. 128, 42 Wash.2d 316, 322, 255 P.2d 360 (1953) (sexual assault on student at school). The prior sexual assaults at Elmview, the earlier policy against unsupervised contact with residents, the opinion of Niece's expert that such unsupervised contact is unwise,[8] and Legislative recognition of the problem of sexual abuse in residential care facilities,[9] all demonstrate that sexual abuse by staff at a group home for developmentally disabled persons may be a foreseeable hazard against which reasonable precautions must be taken.
We hold that (1) the special relationship between a group home for the developmentally disabled and its vulnerable residents creates a duty of reasonable care, owed by the group home to its residents, to protect them from all foreseeable harms, and (2) sexual assault by a staff member is not a legally unforeseeable harm.[10]

NEGLIGENT SUPERVISION
The theory of negligent supervision creates a limited duty to control an employee for the protection of third parties, even where the employee is acting outside the scope of employment.
A master is under a duty to exercise reasonable care so [as] to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
(a) the servant
(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
(ii) is using a chattel of the master, and
(b) the master
(i) knows or has reason to know that he has the ability to control his servant, and
(ii) knows or should know of the necessity and opportunity for exercising such control.

Peck, 65 Wash.App. at 294, 827 P.2d 1108 (quoting Restatement (Second) of Torts § 317 (1965) (emphasis added)). Washington cases have generally interpreted the knowledge element to require a showing of knowledge *428 of the dangerous tendencies of the particular employee. Thompson v. Everett Clinic, 71 Wash.App. 548, 860 P.2d 1054; Peck v. Siau, 65 Wash.App. 285, 827 P.2d 1108. The record does not show that Elmview knew or should have known that Quevedo would sexually assault residents.
Niece bases her negligent supervision claim on more general factors such as (1) the lack of supervision, (2) the abandoned policy against unsupervised contact with residents, (3) the vulnerability of the residents in general and Niece in particular, (4) the prior incidents of sexual abuse by staff at Elmview, and (5) the expert's opinion relating to the need for supervision. Niece contends these factors demonstrate Elmview's knowledge of the need to adequately supervise all of its employees. This argument appears to be an expansion of the existing cause of action for negligent supervision.
Whether or not such an expansion of Washington employer liability is warranted, we find it unnecessary to resolve the issue in this case. Elmview's duty to protect Niece from all foreseeable harms, including the harm of sexual assault by staff, is much broader than its duty as an employer to control its employees. The same evidence that would establish Elmview's negligence under a broad theory of negligent supervision will also establish its negligence in failing to protect Niece from all foreseeable harms. Niece's cause of action for negligent supervision thus collapses into her negligence claim based on Elmview's breach of its special relationship duty of care. We therefore find it unnecessary to determine whether Niece has presented a factually sufficient claim for negligent supervision.

VICARIOUS LIABILITY
Niece and amicus Washington State Trial Lawyers Association (WSTLA) argue that Elmview owed Niece a nondelegable duty of protection which renders Elmview vicariously liable for Quevedo's assaults. This argument is modeled after a recent Indiana Supreme Court decision, Stropes v. Heritage House Childrens Ctr., 547 N.E.2d 244 (Ind.1989). We find Stropes to be incompatible with existing Washington law relating to the scope of an employer's liability for employees' intentional mistreatment of persons to whom the employer owes a duty of care. Such a significant expansion of employer liability should be left to the consideration of the Legislature.
Stropes v. Heritage House Childrens Ctr.
In Stropes, a severely retarded minor resident of a group home who was sexually assaulted by a staff member brought an action against the group home based on its vicarious liability for the assault. Upholding the vicarious liability claim, the Indiana court observed that "once one has, by contract or otherwise, assumed the duty to protect another, the nature of that duty may be such that the responsibility for providing the protection cannot be delegated even though the protective tasks themselves are." Stropes, 547 N.E.2d. at 250. The rationale for this theory was found in the extraordinary standard of care traditionally applied to common carriers.
Under the historical rule, a common carrier is vicariously liable for assaults on a passenger by an employee whether or not the employee was acting within the scope of employment. Stropes, 547 N.E.2d at 251 (citing Indianapolis Union Ry. Co. v. Cooper, 6 Ind.App. 202, 205, 33 N.E. 219, 220 (1893)). This heightened duty of care is based on an implied assurance that a passenger will be transported safely and on the passengers' surrender of control and the carrier's assumption of responsibility. Borrowing these rationales from the common carrier exception, the Stropes court noted that the resident's "contract of passage" contemplated that the home would assume all responsibility for the resident's care and safety. The home had "a non-delegable duty to provide protection and care so as to fall within the common carrier exception." Stropes, 547 N.E.2d at 254. Therefore, the home was liable for the staff member's breach of that duty whether or not he was acting within the scope of employment.
The Nondelegable Duty Theory in Washington:
An early Washington case, Marks v. Alaska S.S. Co., adopts the historical exception *429 for common carriers. Marks v. Alaska S.S. Co., 71 Wash. 167, 127 P. 1101 (1912) (citing 3 Seymour D. Thompson, Law of Negligence § 3166 p. 623 (1902)).[11] But the issue is whether the nondelegable duty should be extended to special relationships other than the relationship between common carriers and passengers. No recent Washington cases have used the nondelegable duty theory to hold an employer liable for an employee's intentionally tortious or criminal conduct outside the scope of employment.[12]
Niece contends this court adopted the nondelegable duty theory in the 1967 case of Carabba v. Anacortes Sch. Dist. No. 103, 72 Wash.2d 939, 435 P.2d 936 (1967). In Carabba, a student wrestler alleged that his injuries were caused by the negligence of the referee, a member of an independent group of volunteer referees. Noting that the district owed the student a duty of protection, the court concluded that this duty was nondelegable and the district was therefore liable. Carabba, 72 Wash.2d at 957-58, 435 P.2d 936.
Our holding that the district's duty of protection was nondelegable was largely based on the Restatement (Second) of Agency § 214 (1958).
A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.
Under § 214, certain voluntary relationships create a duty to see that due care is actually used by servants or agents to protect another party. The Restatement suggests as examples that a railroad would be liable for a conductor who assaults a passenger (the common carrier exception) and that a hotel would be liable for a maid who steals a guest's clothes. Similarly, Niece suggests that Elmview, having delegated its responsibility for Niece's care to Quevedo, remained liable under § 214 for Quevedo's failure to actually provide such care.
Our application of § 214 in Carabba does not compel a determination that group homes should be vicariously liable for sexual assaults on residents, or that any Washington employer should be vicariously liable for the intentional or criminal conduct of employees.[13] A holding that a school district is liable for the negligence of a volunteer referee bears little resemblance to the application of § 214 suggested by Niece. Vicarious liability for intentional or criminal actions of employees would be incompatible with recent Washington cases rejecting vicarious liability for sexual assault, even in cases involving recognized protective special relationships. Bratton, 73 Wash.App. 492, 501-02, 870 P.2d 981 (collecting cases from other jurisdictions), review denied, 124 Wash.2d 1029, 883 P.2d 326 (1994); Peck, 65 Wash.App. at 287, 827 P.2d 1108; Scott, 50 Wash.App. at 47, 747 P.2d 1124. Notwithstanding Carabba, current Washington law clearly rejects vicarious liability for intentional or criminal conduct outside the scope of employment.
*430 Public Policy Considerations:
Indiana is apparently the only jurisdiction to adopt the nondelegable duty theory recognized in Stropes, 547 N.E.2d 244. Before Stropes was decided, the theory was considered and rejected by the Fourth Circuit in a case governed by South Carolina law. Rabon v. Guardsmark, Inc., 571 F.2d 1277, 1281 (4th Cir.) (holding that a security company was not vicariously liable for a rape by one of its security guards), cert. denied, 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978). Since Stropes was decided, other jurisdictions have refused to follow it. See Maguire v. State, 254 Mont. 178, 835 P.2d 755, 759 (1992); Worcester Ins. Co. v. Fells Acres Day School, Inc., 408 Mass. 393, 558 N.E.2d 958, 967-68 (1990). See also Sebastian v. District of Columbia, 636 A.2d 958 (D.C.1994) (declining to follow Stropes because the District of Columbia does not follow the common carrier rule). Whether we should abandon our traditional doctrine of respondeat superior and recognize vicarious liability for sexual assaults under Stropes is ultimately a question of public policy.
In support of the nondelegable duty theory, Niece and WSTLA point to the unique relationship between the most vulnerable members of society and their caregivers. Niece cites a number of studies which suggest that disabled persons are much more likely to be victims of sexual abuse than their nondisabled peers and that sexual abuse of such persons by their caregivers is alarmingly common.[14] Supplemental Br. of Pet'r Niece at 1-3, 5-7. Niece suggests the operators of the group homes are best able to prevent this abuse.
But the broad negligence liability that we have already recognized creates adequate incentives for the operators of group homes for developmentally disabled persons to take all reasonable precautions against sexual abuse in their facilities. The nondelegable duty theory would only impose additional liability without corresponding fault, making group homes the insurers of their employees' conduct.[15] If a group home is to be held liable for an employee's sexual assault even where the group home was not at fault, there must be some other sound policy reason to shift the loss created by the employee's intentional wrong from one innocent party to another. If the studies cited by Niece are accurate, vicarious liability for such abuse would likely be extremely burdensome. It is not at all clear that the imposition of such liability would actually improve the lives of persons who are dependent upon private residential care facilities.
When we are unable to determine the public policy merit of a proposed significant change in the tort law, caution dictates that we defer to the Legislature.[16] Rejecting the imposition of vicarious liability for a teacher's sexual relationship with a student, the Bratton court wrote:
[O]ur imposition of vicarious liability on the school district would be "far-reaching and ... would rearrange, across the state, *431 the responsibility of employers for the conduct of their employees." ... Any needed redirection of social policy is more appropriately the function of the Legislature.
Bratton, 73 Wash.App. at 502, 870 P.2d 981 (citing Kuehn, 24 Wash.App. at 280, 600 P.2d 679) (citations omitted). It is particularly important to recognize the limits on our ability as an appellate court to decide complex questions of public policy where, as here, a decision to impose a new tort liability requires a consideration of factual matters extrinsic to the case before the court. "The Legislature is uniquely able to hold hearings, gather crucial information, and learn the full extent of the competing societal interests." Burkhart v. Harrod, 110 Wash.2d 381, 385, 755 P.2d 759 (1988).
Niece's policy argument raises difficult, unanswered questions about how the cost of such liability would actually be borne. The financial burden created by such strict liability might actually reduce the residential care industry's ability to provide quality care. Would insurance against such liability be affordable or even available? Would the operators of group homes simply pass the cost of such liability on to the families of residents or to the State treasury? Or would commercial providers of residential care shy away from accepting responsibility for the most vulnerable disabled persons, those most in need of residential care? We are unable to answer these questions and we cannot test the economic theories and policy arguments submitted in support of the Stropes liability theory. To the extent the dissent purports to have answers to these difficult questions, those answers are devoid of any supporting evidence or expertise.
All other courts that have considered this issue have prudently refused to follow Stropes and deferred to their state legislatures for the same reasons we have given here. The Montana Supreme Court observed that "such a major change to the respondeat superior doctrine is best left to the legislature." Maguire v. State, 835 P.2d at 759. Two of the five members of the Indiana Supreme Court in Stropes rejected the nondelegable duty theory for the same reasons.
The majority opinion establishes a major difference in the law of this state affecting every health care and custodial institution and virtually makes each of those institutions an insurer of the safety of the persons under their care and control. If such a wide-sweeping change in the substantive law is to take place, it should be done by the legislature and not the judiciary.
Stropes, 547 N.E.2d at 255 (Givan, J., dissenting). We agree. Current Washington law does not support the vicarious liability theory set forth in Stropes and we decline to adopt this theory.
Affirmed.
DOLLIVER, SMITH, GUY, MADSEN and TALMADGE, JJ., concur.
JOHNSON, Justice (concurring in part, dissenting in part).
I concur with the majority's resolution of the special relationship and negligent supervision issues. However, I disagree with the majority's conclusion that a theory of vicarious liability based upon a nondelegable duty of care is incompatible with existing Washington law. Therefore, I would hold Niece stated a valid cause of action of vicarious liability based on Elmview's nondelegable duty of care.
As noted by the majority, Washington courts have historically held common carriers vicariously liable based on the nondelegable duty of care owed to their passengers. Marks v. Alaska S.S. Co., 71 Wash. 167, 127 P. 1101 (1912); Kelly v. Navy Yard Route, 77 Wash. 148, 149, 137 P. 444 (1913). In 1967, this court extended the applicability of the nondelegable duty theory to the public school context, holding a school district liable for the negligent acts of a volunteer agent. Carabba v. Anacortes Sch. Dist. No. 103, 72 Wash.2d 939, 957-58, 435 P.2d 936 (1967). There, the plaintiff, a student athlete, alleged his severe injuries were the result of the negligence of the school district's volunteer official. Carabba, 72 Wash.2d at 940-41, 435 P.2d 936. This court held the school district owed student athletes a nondelegable duty of protection and adopted the Restatement (Second) of Agency § 214 (1958). Carabba, 72 Wash.2d at 957-58, 435 P.2d 936.
Section 214 states:
A master or other principal who is under a duty to provide protection for or to have *432 care used to protect others or their property and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.
Restatement (Second) of Agency § 214 (1958). Comment a to § 214 goes on to state:
Unless one has directed a specific tortious act or result, or has been negligent, he is normally not responsible for the conduct of others, except that of his agents or servants acting within the scope of their employment. By contract, however, or by entering into certain relations with others, a person may become responsible for harm caused to them by conduct of his agents or servants not within the scope of employment; the extent of this liability depends upon the duty assumed.
Restatement (Second) of Agency § 214 cmt. a (emphasis added). Regardless of the protestations of the majority, applying this previously recognized theory in the context of assaults by the employees of group homes for disabled residents is neither contrary to nor an expansion of existing Washington law.
The plain language of section 214 and comment a apply to the facts of this case. As recognized by the majority in the first part of its opinion, group homes for the developmentally disabled owe a duty of care to their vulnerable residents based on the special relationship between the group home and its residents. Majority at 427. This special relationship recognized by the majority is one of those "certain relations" listed in comment a to section 214. This special relationship certainly is more compelling than the special relationship present in the common carrier and school district cases where this court has previously applied section 214. The majority explicitly makes this point:
The special relationship between Elmview and its vulnerable residents is perhaps more significant, for purposes of Elmview's duty of care, than the recognized special relationships between a common carrier and its passengers or between a hotel and its guests. As noted earlier, these special tort duties are based on the liable party's assumption of responsibility for the safety of another. Passengers and hotel guests are merely away from familiar surroundings and relying on their hosts to take the same reasonable precautions that they would take at home. Profoundly disabled persons are totally unable to protect themselves and are thus completely dependent on their caregivers for their personal safety.
Majority at 425 (citation omitted) (footnote omitted). The special relationship between Elmview and Niece requires that Elmview be held responsible for the harm caused by its employee, despite the fact the harm was the result of conduct outside the scope of employment. Because of the compelling nature of the special relationship in this case and the plain language application of section 214 to the facts of this case, I am hard pressed to see how the majority can claim the application of section 214 is incompatible with Washington law. Rather, Washington law mandates application of section 214 in this context.
I am also not convinced that we must defer to the Legislature because of the dire consequences of recognizing this theory of liability predicted by the majority. While I agree that questions of public policy are properly left to the Legislature, the Legislature has already addressed the issue of protecting the rights of the disabled living in group homes. In RCW 70.129.130 and RCW 74.15.010 the Legislature has clearly identified the right of the developmentally disabled to have their health, safety, and well being safeguarded, including the right to be free from sexual abuse, as matters of important public policy. This court has often recognized its role to protect the rights of individuals from tortious acts in contravention of recognized public policy. See, e.g., Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 913 P.2d 377 (1996). In light of our prior case law and the Legislature's recognition of this important public policy, I would protect the rights of the developmentally disabled by applying section 214 to group homes providing care to the developmentally disabled.
In this case, the majority is abdicating its role of protector of the rights of individuals in the face of an explicit articulation of public policy by the Legislature. I would recognize a theory of liability, based on the nondelegable duty of care owed by group homes to *433 their developmentally disabled residents, for the tortious acts of the home's employees regardless of whether those acts are within the scope of employment. The majority expresses concern that the application of the nondelegable duty theory in this context will result in unchecked potential liability for all employers. This concern is misplaced. First, the application of this theory is severely limited by the special relationship requirement and does not broaden potential liability for all employers. Second, the recognition of a special relationship imposing a nondelegable duty of care in this case is limited to the context of group home providers for the disabled. Whether this theory applies to broader situations, such as employees of all health care employers, is a question not presently before this court and best left for another day.[1] Therefore, I dissent.
ALEXANDER and SANDERS, JJ., dissent.
NOTES
[1] See also Miller v. Staton, 58 Wash.2d 879, 365 P.2d 333 (1961) (duty owed by innkeeper or restaurant owner to protect guests from other guests); Bartlett v. Hantover, 9 Wash.App. 614, 513 P.2d 844 (1973) (duty owed by employer to protect employees from criminal activity to which the employment exposes the employee), reversed on other grounds, 84 Wash.2d 426, 526 P.2d 1217 (1974); Marks v. Alaska S.S. Co., 71 Wash. 167, 127 P. 1101 (1912) (duty owed by common carrier to protect passengers from crew members).
[2] Curiously, the Shepard court suggested that the duty to protect vulnerable residents was not dependent upon the existence of a special relationship.

The analysis urged by the parties and adopted by the trial court suggests the necessity of a special relationship as a prerequisite to imposing a duty to protect Ms. Shepard from Mr. Mielke's criminal act. We disagree. The duty of ordinary care here would include the duty of taking reasonable precautions to protect those who are unable to protect themselves.
Shepard v. Mielke, 75 Wash.App. 201, 205, 877 P.2d 220 (1994) (footnote omitted).
Similarly, the Court of Appeals in the present case did not acknowledge that the duty of care owed by Elmview is based on its special relationship to Niece. Contrary to Shepard`s rejection of the necessity of a special relationship, a hospital's duty to protect its patients from the tortious or criminal actions of third parties is entirely based on the special relationship between the hospital and the patient. It is readily apparent from the reasoning in Shepard that the Court of Appeals relied on the protective nature of the relationship in finding a duty to protect the resident. Shepard relied on Hunt v. King County, 4 Wash.App. 14, 481 P.2d 593, review denied, 79 Wash.2d 1001 (1971), which finds a similar duty without using the term "special relationship." Shepard, 75 Wash.App. at 205, 877 P.2d 220 (citing Hunt, 4 Wash.App. at 24, 481 P.2d 593). Nevertheless, the relationship between a hospital and its vulnerable patients is a recognized special relationship. Hutchins v. 1001 Fourth Ave. Assocs., 116 Wash.2d 217, 228, 802 P.2d 1360 (1991). It is only by virtue of this special relationship that a hospital owes its patients a duty of care to protect them from intentional harm by third parties. Likewise, the duty of care at issue in this case and in similar cases is based on the protective function of the special relationship between custodial care-providers and their vulnerable wards.
[3] Niece cites various administrative code provisions as additional support for the proposition that group homes like Elmview are responsible for the health and safety of their residents and thus owe them a duty of care. WAC 246-316-050; former WAC 275-36-180. The provisions cited, however, are not sufficiently specific to illuminate either the precise scope of that duty or whether Elmview breached such a duty.
[4] "[T]here is no reason to differentiate between foreseeable harms caused by potentially hazardous physical conditions (McLeod), visitors (Shepard ) or staff." Niece, 79 Wash.App. at 669, 904 P.2d 784.
[5] Bratton v. Calkins, 73 Wash.App. 492, 870 P.2d 981 (teacher's sexual relationship with student), review denied, 124 Wash.2d 1029, 883 P.2d 326 (1994); Thompson v. Everett Clinic, 71 Wash. App. 548, 555, 860 P.2d 1054 (1993) (physician's inappropriate sexual conduct in treating clinic patients), review denied, 123 Wash.2d 1027, 877 P.2d 694 (1994); Blenheim v. Dawson & Hall, Ltd., 35 Wash.App. 435, 667 P.2d 125 (rape committed by construction contractor's employees at a Christmas party), review denied, 100 Wash.2d 1025 (1983); Kuehn v. White, 24 Wash.App. 274, 277, 600 P.2d 679 (1979) (assault by truck driver on another motorist); Kyreacos v. Smith, 89 Wash.2d 425, 572 P.2d 723 (1977) (premeditated murder by police officer).
[6] Whether the trial court properly dismissed Niece's claims for negligent supervision is discussed in the next section.
[7] "This concept that one may have a duty to control the actions of another (as opposed to a victim placed in the care of defendant) is described as also including, among others, the relationships between employer and employee, tavern keeper and intoxicated guest, physician and assistants, hospital and unqualified physician, and parents and children." Hutchins, 116 Wash.2d at 229, 802 P.2d 1360 (citing W. Page Keeton et al., Prosser and Keeton on Torts § 56, at 383 (5th ed.1984) (emphasis added)).
[8] The expert's opinion was based, at least in part, on an incorrect understanding of the facts relating to Quevedo's particular responsibilities in caring for Niece in the absence of other staff. This discrepancy may affect the weight and relevance of the expert's testimony at trial. See Niece, 79 Wash.App. at 670 n. 2, 904 P.2d 784. The expert's opinion that lengthy periods of unsupervised contact with residents was inappropriate sufficiently raises the factual issues of whether Elmview exercised due care and whether Quevedo's actions were foreseeable.
[9] RCW 70.129.130 recognizes the right of residents of long-term care facilities to be free from abuse, including sexual abuse. See infra note 16.
[10] The foreseeability of Quevedo's assault upon Niece remains a question of fact for the jury. Johnson v. State, 77 Wash.App. 934, 942, 894 P.2d 1366 (citing McLeod, 42 Wash.2d at 321-23, 255 P.2d 360), review denied, 127 Wash.2d 1020, 904 P.2d 299 (1995).
[11] See also Caldwell v. Northern Pac. Ry. Co., 56 Wash. 223, 105 P. 625 (1909). Marks has not been overruled and recent federal cases have followed it. See Gilstrap v. Amtrak, 998 F.2d 559, 561 (8th Cir.1993) (rejecting the argument that Marks is no longer good law). See also Morton v. De Oliveira, 984 F.2d 289 (9th Cir.), cert. denied, 510 U.S. 907, 114 S.Ct. 289, 126 L.Ed.2d 238 (1993). However, it has also been suggested that the common carrier exception is no longer a viable tort rule in light of the modern doctrine of respondeat superior. Adams v. New York City Transit Auth., 88 N.Y.2d 116, 666 N.E.2d 216, 643 N.Y.S.2d 511 (1996). We decline to determine the viability of this historical rule in a case which does not squarely present the issue.
[12] In 1909, this court found that a tavern owner could be liable for a bartender who intentionally set fire to a sleeping patron's foot. Beilke v. Carroll, 51 Wash. 395, 98 P. 1119 (1909).
[13] The Restatement expressly reserves the issues of (1) which protective relationships give rise to such liability and (2) whether the resulting duty of care is satisfied by the exercise of due care in the delegation of the protective tasks or only where due care is actually used by the servants to whom the protective tasks are delegated. "A statement of the situations in which a duty of this sort exists and of the limits of such duty is beyond the scope of the Restatement of this Subject." Restatement (Second) of Agency § 214 cmt. e.
[14] Elmview and WDTL do not refute these studies or suggest that sexual abuse of developmentally disabled persons is not a significant social problem.
[15] WSTLA's response to this observation is particularly disingenuous. "Vicarious liability based on a non-delegable duty does not make group homes `insurers.' An injured resident must still prove fault on the part of an employee to whom the group home has delegated its care-giving responsibility." Supplemental Br. of Amicus WSTLA at 5 (citation omitted). Intentionally tortious or criminal conduct, such as sexual assault upon a developmentally disabled person, will virtually always constitute fault on the part of the employee.
[16] Niece and WSTLA cite RCW 70.129.170 for the proposition that the Legislature recognizes the court's role in determining the rights and remedies available to residents of group homes and other types of residential care facilities. RCW Chapter 70.129 guarantees the basic rights of residents of long-term care facilities, including the right to free from abuse, including sexual abuse. RCW 70.129.170 provides that while residents and residential care facilities should use informal means to resolve disputes regarding those rights, the provisions of the statute should not be construed to restrict existing legal remedies, "including any remedy available to an individual at common law" or to "operate in derogation of any right of action on the part of any individual." Assuming, arguendo, that RCW 70.129.170 applies to group homes licensed under RCW 74.15, recognition of our authority to develop Washington tort law does not preclude our reservation of complex questions of public policy for the consideration of the Legislature.
[1] See Adam A. Milani, Patient Assaults: Health Care Providers Owe a Non-Delegable Duty to Their Patients and Should be Held Strictly Liable for Employee Assaults Whether or Not Within the Scope of Employment, 21 Ohio N.L.Rev. 1147 (1994).