Susan STAUSS by Guardians Alfred Stauss and Alice Stauss, Plaintiffs-Respondents,††

v.

OCONOMOWOC RESIDENTIAL PROGRAMS, INC., d/b/a Homes for Independent Living, and Continental Insurance Company, Defendants-Appellants,†

COUNTY OF WASHINGTON, Defendant-Respondent.

Court of Appeals

*No. 99–2481. Oral argument September 28, 2000.—Decided November 29, 2000.*

2000 WI App 269

(Also reported in 621 N.W.2d 917.)

††Petition to cross-review denied.
†Petition to review denied.

On behalf of the defendants-appellants, the cause was submitted on the briefs of and oral argument by *M. Christine Cowles* and *Patrick S. Nolan* of *Borgelt, Powell, Peterson & Frauen, S.C.*, Milwaukee.

On behalf of the plaintiffs-respondents, the cause was submitted on the brief of and oral argument by *Timothy J. Algiers* and *James R. Danaher* of *O'Meara, Eckert, Pouros & Gonring, LLP*, West Bend.

Before Brown, P.J., Anderson and Snyder, JJ.

¶ 1.   ANDERSON, J.   Susan Stauss (Stauss), by her legal guardians Alfred Stauss and Alice Stauss, brought an action for damages against the private group home Oconomowoc Residential Programs, Inc., d/b/a Homes for Independent Living, and Continental Insurance Company (HIL) after she was sexually assaulted by a staff member at the home. At the close of a four-day jury trial, the trial court ordered judgment against the defendant HIL. HIL appeals the judgment for several reasons. However, because we conclude that the real controversy was not fully tried, we decline to address HIL's rationale for appeal. We therefore reverse and remand for a new trial.

## BACKGROUND

¶ 2.   Stauss is a developmentally disabled, thirty-nine-year-old woman diagnosed with Cornelia

DeLange Syndrome.[1] She is mentally disabled with the emotional capacity of a five-year-old child. Stauss's parents/guardians placed her at HIL in December 1995. In the spring of 1996, HIL hired Dean DeVries to be a HIL counselor. On numerous occasions between late October 1996 and January 4, 1997, DeVries sexually assaulted Stauss.

¶ 3.   Prior to the first incident of sexual abuse, both Stauss's mother and sister expressed concerns to HIL staff members about DeVries's competency as a counselor. HIL supervisors were notified that DeVries's behavior on the job was at times inappropriate. On one occasion, a co-worker of DeVries reported that she saw DeVries with Stauss and other residents jumping on a bed in the staff office. On another occasion, a co-worker of DeVries discovered Stauss sitting on DeVries's lap laughing and joking with him. After each of these incidents, HIL supervisors merely told DeVries his behavior was inappropriate and it should not happen again. No one from HIL informed Stauss's guardians of the bed-jumping and lap-sitting incidents.

¶ 4.   HIL assigned DeVries to overnight shifts within one to two weeks of being hired. HIL left DeVries unsupervised and completely in charge during his overnight shifts. No one from HIL ever dropped in to check on DeVries. DeVries was first assigned to HIL's Washington Street group home where he was in

---

[1] Cornelia DeLange Syndrome involves two prominent areas of concern, mental and physical: (1) retardation or severe cognitive delays; basically functioning more like a young child than an adult as far as cognitive ability is concerned. If the individual has cognitive functioning at the level of a child, he or she is also going to socially function much like a child; (2) there can be some physical deformities. There is generally shortness of stature and a number of other physical factors.

charge of eight residents—seven females, including Stauss, and one male. Later, he was transferred to HIL's Park Avenue apartment to supervise overnights for three female residents, including Stauss. As part of DeVries's duties, he was required to make sure the residents went to bed at a reasonable time. However, DeVries was not trained as to what to do if a resident would not cooperate. At one point, Stauss refused to go to bed. DeVries said that he "wasn't sure how to handle the situation." He "handled" it by allowing Stauss to stay up with him and watch TV. The first time he allowed Stauss to do this, they watched TV until 2:00 a.m.; Stauss still refused to go to bed. DeVries then said he was very tired and decided to let Stauss sleep with him.

¶ 5. DeVries's practice of allowing Stauss to sleep with him whenever he was working an overnight became a habit. This habit eventually led to regular sexual assaults on Stauss by DeVries between October 1996 and January 1997. DeVries admitted to having had a total of fifty ejaculations while with Stauss. DeVries testified that he told Stauss he loved her and never wanted to hurt her. Stauss became very attached to DeVries and thought of him as her boyfriend.

¶ 6. In January 1997, Stauss told her sister about her sexual contacts with DeVries. Stauss's family informed HIL that Stauss claimed to be having regular sexual contacts with DeVries. At first HIL did not believe Stauss's allegations. HIL never contacted the police to report the allegations, but eventually HIL did fire DeVries. The Stauss family involved the police and ultimately DeVries was charged, tried and convicted of the sexual assault of Stauss.

## PROCEDURAL DISCUSSION

¶ 7.   On May 22, 1998, Stauss filed a complaint against DeVries's employer, HIL, stating the following causes of action:

1.   Intentional Infliction of Emotional Distress.

2.   Negligent Infliction of Emotional Distress.

3.   Negligence.

4.   Breach of Statutory Rights.

5.   Sexual Exploitation, Sec. 895.70.

Stauss's third cause of action alleged, among other things: a "[f]ailure [on HIL's part] to adequately supervise, care for, assist, and counsel [Stauss]" and a "[f]ailure [on HIL's part] to ensure [Stauss's] safety, privacy, dignity, and freedom from physical/mental/sexual abuse." This claim is based on HIL's alleged failure to supervise Stauss. While the jury heard argument with regard to HIL's duty to supervise DeVries, we hold that the claim of negligent supervision of Stauss was not sufficiently tried. HIL's duty to supervise Stauss is manifestly different from HIL's duty to supervise DeVries. The basis for each claim rests upon "discrete and separate failings by the alleged tortfeasor." *Gritzner v. Michael R.*, 228 Wis. 2d 541, 558, 598 N.W.2d 282 (Ct. App. 1999), *aff'd in part, rev'd in part*, 235 Wis. 2d 781, 611 N.W.2d 906, 2000 WI 68 (reversal on other grounds).

¶ 8.   Such distinctions between these two different theories of liability became blurred by the confusing form of the question submitted to the jury. Primarily this confusion resulted because the pertinent special verdict question was posed in the

disjunctive, leaving it impossible to determine what question the jury answered.[2]

> If, and only if, you answered Question Two "yes," then answer this question, Question No. Three. During [DeVries's employment], was the defendant [HIL] negligent with respect to the hiring, training or supervision of Dean DeVries *or* the supervision of Susan Stauss? (Emphasis added.)
> Answer: Yes.

Likewise, we cannot know what the jury considered when answering "no" to the cause question referring back to the breach question:

> If, and only if, you answered Questions Two and Three "yes," then answer this question. Question No. Four: Was such negligence of [HIL] a cause of the wrongful acts of its employee Dean DeVries?
> Answer: *No.* (Emphasis added.)

¶ 9. After the jury verdict came in, a motions-after-verdict hearing was held. There, the trial court changed the jury's answer to question four from a "no" to a "yes." The trial court reasoned:

> I am changing [the answer to question four from a no to a yes]—Even though I believe that I need not

---

[2] In order to provide a context for the reader, special verdict questions one and two are as follows:

Question No. One: While an employee of the Defendant [HIL] during 1996 and 1997, did Dean DeVries commit wrongful acts, to-wit; sexual contacts, with the plaintiff Susan Stauss?
    Answer: Yes.
    (Answered by the Court)

Question No. Two: Were such wrongful acts a cause of injury to the Plaintiff Susan Stauss?
    Answer: Yes.

in order to sustain a Judgment. But I am, in order to rectify any clarification, and I believe in conformity with the evidence that was presented during the trial, changing the answer of Question No. Four from no to yes; and grant Judgment on the Verdict in the sum of $3,010,000, plus tax, costs and interest against [HIL].

¶ 10.   We will not address HIL's argument that the trial court erred when it changed the jury's answer to question four. We do not decide this or any of the issues HIL brings up on appeal because our determination that the real controversy was not fully tried is dispositive. Consequently, we hold that the complaint sufficiently states a cause of action in negligence based on HIL's failure to supervise Stauss. However, the question remains whether HIL breached this duty to Stauss. Therefore, reversal and a new trial are necessary.

## STANDARD OF REVIEW

¶ 11.   Both ch. 752 of the Wisconsin Statutes and our supreme court's decision in *Vollmer v. Luety*, 156 Wis. 2d 1, 19, 456 N.W.2d 797 (1990), give this court broad discretionary reversal power. WISCONSIN STAT. § 752.35 (1997–98)[3] provides in pertinent part:

In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, . . . the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may . . . remit the case to the trial court . . . for a new trial.

[3] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

¶ 12. When the real controversy has not been fully tried, it is unnecessary for us to first conclude that the outcome would be different on retrial. *See Vollmer*, 156 Wis. 2d at 19.

## DISCUSSION

¶ 13. We consider it self-evident that a group home that takes on the supervision, custody and control of a disabled person stands in a "special relationship" to such person for purposes of the person's protection. Wisconsin already recognizes several "special relationships" that give rise to a duty to prevent harms caused by the intentional or criminal conduct of third parties. A psychiatrist and a therapist had a duty to prevent emotional harm to the parents of a patient whose treatment allegedly caused false memories of parental abuse where some harm was foreseeable. *See Sawyer v. Midelfort*, 217 Wis. 2d 795, 813, 579 N.W.2d 268 (Ct. App. 1998), *aff'd,* 227 Wis. 2d 124, 595 N.W.2d 423 (1999). Certain caregivers, such as hospitals and prisons, assume enhanced responsibilities in protective or custodial situations, and this increased duty obligates the caregivers to shield the protected person from the foreseeable consequences of injurious conduct. *See Jankee v. Clark County*, 2000 WI 64, ¶ 92, 235 Wis. 2d 700, 612 N.W.2d 297. An adult who voluntarily takes on the supervision, custody or control of a visiting child stands in a "special relationship" to such child for purposes of the child's protection. *See Gritzner*, 228 Wis. 2d at 554.

¶ 14. On appeal, Stauss presented, for the first time, the persuasive authority of *Niece v. Elmview Group Home*, 929 P.2d 420 (Wash. 1997). In *Niece*, as in

the case at hand, a developmentally disabled woman brought an action for damages against a private group home after she was sexually assaulted by a staff member at the home. The *Niece* court explained that a group home's function is to provide care for those who are unable to provide care for themselves because of physical or mental impairment. *See id.* at 424. In *Niece*, the court pointed out that "residents of group homes are more vulnerable to abuse by staff than by visitors or other third parties." *Id.* at 425. Staff members have greater access to residents than the general public and residents are unable to protect themselves and are thus dependent on their caregivers for their personal safety. *See id.* at 424–25. Sexual assault may be foreseeable unless it is so out of the ordinary or improbable as to be completely outside the realm of expectability. *See id.* at 427.

¶ 15.    We agree with *Niece*'s logic. Like the *Niece* court, we recognize that a group home has a duty to protect its residents from the harm against which they are least able to protect themselves—abuse at the hands of staff. *See id.* at 425. We therefore adopt the *Niece* reasoning and hold that: "(1) the special relationship between the group home and its vulnerable residents gives rise to a duty of reasonable care, owed by the group home to its residents, to protect the residents from all foreseeable harms, and (2) sexual assault by a staff member is not a legally unforeseeable harm." *Id.* at 422.

¶ 16.    In the case at hand, the jury learned that: HIL was a group home, Stauss was a resident of HIL, DeVries was a staff member of HIL, and DeVries sexually assaulted Stauss. The jury was not informed that HIL and Stauss had a "special relationship" which car-

ried a duty on HIL's part to protect Stauss from all foreseeable harm. The jury was not aware that sexual assault by a group home staff member is not a legally unforeseeable harm.

¶ 17.   We recognize that the court below did not have the benefit of precedent to rely upon. With our adoption of a *Niece*-like tort, the parties, the trial court and therefore the jury will have a framework on which to base argument, instruction, and decision, respectively. The jury will have an opportunity to hear the real controversy be tried under the proper analysis. We caution that we do not purport to suggest an outcome. We simply provide the proper avenue in which to determine whether a duty was breached. With that, the trial court decision is reversed and the cause is remanded for a new trial.

*By the Court.*—Judgment reversed and cause remanded with directions.